**4934, INCORPORATED, t/a The Godfather, Petitioner,**

v.

**Mayor Walter E. WASHINGTON and District of Columbia Alcoholic Beverage Control Board, Respondents.**

**No. 9421.**

District of Columbia Court of Appeals.

Argued Oct. 15, 1975.

Decided April 11, 1977.

---

Benjamin B. Brown, Silver Spring, Md., with whom Isadore B. Katz and Jules Fink, Silver Spring, Md., were on the brief, for petitioner.

David P. Sutton, Asst. Corp. Counsel, Washington, D.C., with whom C. Francis Murphy, Corp. Counsel, Washington, D.C., at the time the brief was filed, Louis P. Robbins, Acting Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D.C., were on the brief, for respondents.

Before KERN, Associate Judge, REILLY, Chief Judge, Retired, and HYDE, Associate Judge, Superior Court.*

REILLY, Chief Judge, Retired:

Petitioner seeks review of an order of the Alcoholic Beverage Control Board (referred to herein as "the Board") suspending its Class "C" retail liquor license for a period of 60 days predicated upon violations of D.C. Code 1973, §§ 25–118 and 22–2001(a)(1)(B). The suspension ordered by the Board was for a period of 90 days, reduced by the Mayor, after an appeal to his office, to 60 days.

Petitioner corporation is the operator of an eating and drinking establishment located in a three-level building on Upper Wisconsin Avenue called "The Godfather." Under its restaurant (at street level), is a nightclub consisting of a large rectangular room containing about 40 tables. At the far end is a bar and diagonally across from it, a small stage or platform. Customers at the bar or tables, where drinks are also served, are entertained by a series of "go-go" dancers—some 10 young women being employed for this purpose.

One night in February of 1975, three nonuniformed police officers came to the nightclub on assignment and seated themselves near the stage. After observing three dances, they then watched another dancer—a Miss Miranda—engage in a performance which caused them to arrest her. According to their testimony at the hearing before the Board, Miss Miranda was dressed only in a "sheer-type negligee with bikini-type panties" which at one point she slipped to her knees while she was dancing. Then, replacing her lower garment, she removed her negligee, resumed dancing, and on occasions during a performance lasting one half-hour, wrapped her legs around the shoulders of four or five male customers who were leaning over the rim of the stage, pulled another against her, and allowed another a pectoral kiss. When she left the platform, the officers placed her under arrest, together with the manager and co-owner, Thomas Motlagh, charging both with a violation of D.C. Code 1973, § 22–2001(a)(1)(B), which forbids presentation of obscene exhibitions.[1]

Although the United States Attorney's Office decided not to prosecute, the Board served petitioner with a rule to show cause as to why its license should not be suspended or revoked. After hearing the testimony of the policemen and a witness called by petitioner, the Board issued an order of license suspension accompanied by some 16 findings of fact consisting of a description of the locale, the visit of the officers, and the Miranda dance.

---

* Sitting by designation pursuant to D.C. Code 1973, § 11–707(a).

1. These subsections provide:
  (a)(1) It shall be unlawful in the District of Columbia for a person knowingly—
  * * * * * *

  (B) to present, direct, act in, or otherwise participate in the preparation or presentation of, any obscene, indecent, or filthy play, dance, motion picture, or other performance;
  . . . .

The first 13 of these findings are supported by substantial evidence, based on the testimony of the police witnesses, which we have summarized. The Board also found that "during . . . Miranda's performance . . . Motlagh, the owner, was present and took no action to limit or terminate the performance." [2] From these preliminary findings, the Board found that—

16. The Respondent's method of operation is such as to harbor and encourage the conduct set forth in FINDINGS 5 through 13 . . .

and concluded that

. . . in violation of Sections 25–118 [3] and 22–2001(a)(1)(B), D.C. Code (1973 Edition), Respondent did unlawfully and knowingly present and otherwise participate in the preparation of an obscene, indecent and filthy performance by Rosemary Miranda . . . .

Petitioner contends that Finding 16 is lacking in evidentiary support and that the conclusion was erroneous as a matter of law. In attacking the conclusion, petitioner argues that the statutes held to have been violated were unconstitutionally vague, and, as construed by the Board, proscribed conduct protected by the First Amendment.

In assailing the quoted finding (No. 16), petitioner says that the phrase "method of operation" implies a calculated plan on the part of management to provide the kind of performance given by the danseuse Miranda on this particular occasion but that this finding, based on one isolated incident, is lacking in evidentiary support. It points out that the record discloses that two of the plainclothesmen upon whose testimony the Board relied had observed the nightclub dances on prior occasions, and that uniformed police officers from a neighboring precinct station dropped into the club almost daily. Yet none of these official and unofficial visits had ever resulted in a citation. Moreover, there was evidence that each dancer was warned by the management against complete bodily exposure or physical contact with customers, and that Miranda was subsequently reprimanded for deviating from these instructions.

The challenged finding is a crucial one. Its wording was obviously lifted from a leading case on license revocation, *Am-Chi Restaurant, Inc. v. Simonson,* 130 U.S.App. D.C. 37, 39, 396 F.2d 686, 688 (1968). In affirming a suspension order directed against another nightclub, the court observed that such suspension was based on evidence that one of its dancers had solicited a male patron (an undercover police officer) for prostitution. [4] It rejected the licensee's disclaimer of responsibility under § 25–118, *supra* note 3, by saying that even if unaware of this specific incident, the licensee's "method of operation"—employment of off-stage dancers to sit with customers at individual tables and then to persuade them to order additional drinks—was bound to encourage solicitations for prostitution. In the instant case, however, we find it difficult, in the absence of any evidence showing a continuous course of con-

---

2. Finding 14. This finding was based on testimony that Motlagh had been seen in the room at some time when the Miranda dance was in progress. There was no testimony that Motlagh was present during the entire performance, and petitioner makes the point that Motlagh, as manager (he was apparently only a part-owner), was also charged with supervisory duties over the restaurant operations on *the two upper floors.*

3. This section provides in relevant part:
   If during the period for which any license was issued the licensee shall be convicted of any felony, or if any licensee violates any of *the provisions of this chapter* or any of the rules or regulations promulgated pursuant thereto or fails to superintend in person, or through a manager approved by the Board, the business for which the license was issued, or allows the premises with respect to which the license of such licensee was issued, to be used for any unlawful, disorderly, or immoral purpose, or such licensee otherwise fails to carry out in good faith the provisions of this chapter, the license of said licensee may be revoked or suspended by the Board after the licensee has been given an opportunity to be heard in his defense, subject to review by the Commissioner in case of revocation or in case of suspension for a period of more than thirty days, as herein provided. . . .

4. *Am-Chi Restaurant, Inc. v. Simonson,* 130 U.S.App.D.C. at 39 n.4, 396 F.2d at 688 n.4.

duct—to sustain the finding that the licensee had adopted a "method of operation" which encouraged the sort of performance deemed illegal by the arresting officers.

Wholly apart from this issue, the *Am-Chi* case is distinguishable in another respect. In both that case and this, the charge under § 25–118 was predicated upon the licensee's allowing the premises to be used for an unlawful purpose. In *Am-Chi,* such unlawful purpose consisted of a solicitation for prostitution—a conceded violation of D.C. Code 1973, § 22–2701. Here, the Board assigned as the "unlawful" purpose, an asserted breach of § 22–2001(a)(1)(B), which forbids the presentation of "any obscene, indecent, or filthy play, dance, motion picture . . . ."

The key words in this subsection of the Code, "obscene, indecent" were derived from a Congressional statute, Act of March 3, 1901, 31 Stat. 1332, Ch. 854, § 872. At the time this statute was enacted—and for more than a generation thereafter—it was taken for granted by students of the Federalist papers and the legislative history of the Bill of Rights that the guarantees of freedom of speech and press provided by the First Amendment were incorporated into the Constitution for the protection of the orator, the pamphleteer and the publisher. In that age of innocence, it was assumed that the function of enforcing prohibitions against obscenity on stage and screen was properly confided to the varying judgments of municipal licensing authorities and state boards of censorship. But more recently the highest courts have extended these constitutional protections to the playwright. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); the moviemaker, *Kingsley Pictures Corp. v. Regents,* 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959), and the choreographer, *In re Giannini,* 69 Cal.2d 563, 72 Cal.Rptr. 655, 446 P.2d 535 (1968), *cert. denied sub nom. California v. Giannini,* 395 U.S. 910, 89 S.Ct. 1743, 23

L.Ed.2d 223 (1969), and in doing so seem to have applied the same limitations on state obscenity laws previously enunciated with respect to books and magazines. *Compare Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), with *Paris Adult Theatre I. v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), and *United States v. 12 200-Ft. Reels of Film,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973)—all handed down the same day.

In this series of decisions, the Supreme Court, discarding some of the tests it had adopted in *Memoirs v. Massachusetts,* 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), adopted new guidelines to determine what constitutes obscenity subject to regulation under the police power of the states. These opinions, analyzed by this court in some detail in *Retzer v. United States,* D.C.App., 363 A.2d 307 (1976), made it clear that state statutes proscribing obscene presentations—but not defining the word "obscene" [5]—would not pass muster unless judicially construed as directed only at such "hard core" indecencies as would run afoul of cognate federal statutes. Accordingly, in *Retzer* we limited the scope of the local statute challenged here to such productions as those which (in the words of the *Miller* opinion) are:

> (a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

> (b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.

In oral argument, government counsel with commendable candor conceded that under the narrow construction which must be given to such statutes as § 22–2001(a)(1)(B), he was not contending that the conduct of the dancer or that of the licensee in allowing such a performance, amounted to a criminal offense. He argued, however, that in a proceeding to sus-

---

5. The provision of the Code upon which charges in this case were preferred—§ 22–2001(a)(1)(B)—and attacked by petitioner as vague and overbroad, falls into this category, although another part of this section (subsection (b)) intended for the protection of children under 17 contains a number of specific definitions.

pend or revoke a retail liquor license it was not necessary to prove that the offending exhibition violated a criminal statute, citing *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972). This was a case in which a majority of the Supreme Court held that an administrative agency with authority to license sales of alcoholic beverages in the state could validly promulgate rules regulating the kind of entertainment presented in licensed bars and nightclubs even though some of the performances to which these regulations addressed themselves were ". . . within the limits of the constitutional protection of freedom of expression . . . ."[6] The Court noted that the Twenty-first Amendment, relating to the power of states and territories to control the delivery and use of liquor, conferred ". . . something more than the normal state authority over public . . . morals."[7]

■ Unlike the administrative agency whose regulations were drawn into issue by the plaintiffs in *LaRue, supra,* the licensing board in the instant case is not empowered to promulgate regulations—such authority in this jurisdiction being vested in the District Council. D.C. Code 1973, § 25–107. We have little doubt that under this section, the Council does have the power to condition the retention of alcoholic beverage licenses upon compliance with published regulations concerning the entertainment programs of licensed nightclubs. Neither in its brief nor at oral argument, however, did government counsel indicate that any such regulations had been issued. In any event, as the Board's suspension order was expressly based upon an asserted violation of § 22–2001(a)(1)(B), it must stand or fall upon the question of whether the Miranda dance was the kind of performance forbidden by this provision of the Code as construed in our *Retzer* decision.

■ In our opinion, this question must be answered in the negative, as nothing that the dancer did amounted to the "patently offensive" kind of representation which the *Retzer* decision, adopting the *Miller* standards, described. While the dancer may have exceeded the proprieties concerning attire and contact with patrons laid down by club management for the guidance of the entertainers—pursuant apparently to some informal understanding with the police—her dishabille and coyness with the customers did not differ markedly from performances given 50 years ago in the apron of the Old Howard[8] or on the stage of the Washington Gayety by such legendary figures as Ann Corio, Lily St. Cyr, and Gypsy Rose Lee. Indeed, in a jurisdiction where complete nudity in playhouses as well as in burlesque theatres seems to be accepted, the Miranda dance can scarcely be described as offensive to community standards.[9] Nor did it overstep the constitutional protections noted by the Supreme Court in *Miller* and its companion cases.[10] Accordingly, the order of the Board cannot be sustained.

*Order vacated.*

---

**6.** *California v. LaRue,* 409 U.S. at 118, 93 S.Ct. at 397.

**7.** *Id.,* at 114, 93 S.Ct. at 395.

**8.** A famous burlesque house, which flourished in Boston from the turn of the century into the 1940's, and is fondly recalled by the Harvard poet, Donald S. Gibbs—

Last, we'll head for Lock-Ober's
The Copley or the Ritz
And wish the dear Old Howard
Had beat the building blitz.

Yes, we'll tour Boston city,
Where the Yankee saints have trod. . .

["Now & Then", Cambridge, Mass. (1976).]

**9.** *See* Zito, *This is Burlesque,* Washington Post, Potomac Magazine, March 27, 1977.

**10.** *Cf. Clarke v. United States,* D.C.Mun.App., 160 A.2d 97 (1960). This decision can no longer be deemed controlling for the reasons set forth in *Retzer v. United States,* D.C.App., 363 A.2d 307 (1976).