**D. T. CORPORATION et al., t/a the Godfather, Petitioners,**

v.

**The DISTRICT OF COLUMBIA ALCOHOLIC BEVERAGE CONTROL BOARD, Respondent,**

**Robert W. Anderson et al., Intervenors.**

**No. 12681.**

District of Columbia Court of Appeals.

Argued May 10, 1978.

Decided Nov. 6, 1979.

Benjamin B. Brown, Washington, D. C., for petitioners.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Washington, D. C., at the time the case was briefed, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for respondent and intervenors.

Robert Allen Evers entered an appearance for intervenors.

Before NEWMAN, Chief Judge, and MACK and FERREN, Associate Judges.

MACK, Associate Judge:

This cause presents for our consideration an order of the Alcoholic Beverage Control Board of the District of Columbia, denying the transfer of a Class C retailer's license. Petitioners argue that the Board erroneously 1) ruled the transfer of a liquor license from one corporation to another was inappropriate on the grounds that entertainment provided on the subject premises violated the law; 2) prohibited the transfer of a license in existence for six years to another corporation at the same location when the neighbors had never previously complained of the operation of the business; and 3) denied the transfer of the license because of the licensee's policy prohibiting the admission of minors to the premises.

For the reasons stated below, we remand the case for further Board action.

## I

D. T. Corporation is owned solely by Dehnad Taiedi, who is also its president. Mr. Taiedi filed an application with the Board requesting approval of the transfer of a retailer's license, Class C, held by 4934, Inc.[1] for a restaurant at 4934 Wisconsin Avenue, N.W., to petitioner for a restaurant at the same address.[2] The Board held a public hearing on the protested application in accordance with Section 14(b) of the Alcoholic Beverage Control Act, D.C.Code 1973, § 25–115(b).

Petitioners seek this transfer to license a restaurant to be called the Godfather (also the trade name of the existing restaurant at that location). The new licensee would operate essentially the same type of business as the present licensee. The seating capacity would be 90–92, the hours of operation from 11:00 a. m. to 2:00 a. m. during the week, and from 11:00 a. m. to 3:00 a. m. on Friday and Saturday. Hot food such as hamburgers and pizzas would be served until 10:00 p. m., after which only cold sandwiches would be available. The entertainment would consist of a jukebox and nude go-go dancers. No provisions would be made for parking; patrons would have to use street meters.

Members of the community and representatives of community groups testified at the hearing in opposition to the granting of the application. They testified that the noise created by departing patrons of the present licensee disturbed the residents of the area, consisting largely of single-family dwellings with some family-oriented commercial establishments. These witnesses indicated that the departing patrons were drunk and unruly, that they shouted obscenities as they walked to their cars, threw bottles and litter along the street, and vomited and urinated in the yards and the doorways to other commercial establishments. The Board also heard general complaints of crimes and arrests in the area attributable to the presence of the original Godfather. According to the testimony, these problems stemmed in large measure from the inadequate parking which required patrons to travel through the neighborhood on their way to cars, a situation which would continue with the new Godfather. In the view of the neighbors, petitioner's operation of the establishment in the same manner would mean a continuation of these disturbances.

On September 19, 1977, the Board issued its findings of fact and conclusions of law, denying the application on the grounds that the premises did not qualify as "appropriate" for the transfer of the retailer's license Class C. Following a denial of the petition for reconsideration by the Board, petitioners sought review.

## II

A. Petitioners' first and second arguments are not persuasive. It is true that the Godfather could not suffer legal penalty for featuring exotic dancing.. *4934, Inc. v. Washington,* D.C.App., 375 A.2d 20 (1977). However, despite petitioners' contention to the contrary, the Board in the instant case did not make a finding that the entertainment provided by the licensee was illegal, nor was the license denial based on the nature of the entertainment. Petitioners' second argument cites no authority for the assertion that neighborhood residents might be estopped from protesting reissuance or transfer of a license by their prior silence.

B. In its decision denying petitioners' application, the Board found that the Godfather refused admittance to minors, and concluded that such a policy was contrary

1. The present licensee, 4934, Inc., petitioned the court to review the Board's refusal to permit it to intervene in its petition for reconsideration. Subsequently 4934, Inc. challenged in this court the legal sufficiency of an Order of the Board denying its application for renewal of the license. *See 4934, Inc. v. D. C. Alcoholic Beverage Control Bd.,* No. 13867, remanded November 6, 1979 in light of the instant decision.

2. According to D.C.Code 1973, § 25–111(g), a retailer's license, Class C, shall be issued for, *inter alia,* a bona fide restaurant, hotel or club, and authorizes the holder to sell spirits, wine and beer for consumption on the premises.

to § 47–2902(a) of the equal services laws,[3] D.C.Code 1973, § 25–103(n)[4] and –111(g)[5] which define a "bona fide restaurant," and 34 DCRR 15–1(a)[6] of the District of Columbia Human Rights Law barring discrimination based on age. It was the Board's opinion that the use of the words "persons" in the equal services law, and "public" in the statutes defining restaurants, coupled with the Human Rights Law gives minors a civil right to frequent places like the Godfather for the purpose of obtaining meals. Petitioners challenge this construction.

■ We agree the Board erred in concluding that § 47–2902(a) mandates nondiscriminatory treatment based on age. This section of the equal services laws was part of an 1870 Act of the City of Washington, directed solely at remedying racial discrimination in the District of Columbia. *See Tynes v. Gogos,* D.C.Mun.App., 144 A.2d 412, 414–15 n. 4 (1958); *see generally District of Columbia v. John R. Thompson Co.,* 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953). It cannot be construed as requiring equal services to minors.

■ Moreover, the Board's reading of the Human Rights Law, 34 DCRR 15.1, as prohibiting age discrimination in establishments such as the Godfather is also incorrect. That section while prohibiting age discrimination in public accommodations, defines "age" as "18 years of age or older." 34 DCRR 3.1. Therefore, this section would not apply to limitations on minors' access to the Godfather.

Absent these two foundations for the Board's decision, there is no independent basis for its interpretation of the phrase "held out to the public" in § 25–103(n) as prohibiting the exclusion of minors. To the contrary, another section of the same title regulating alcoholic beverages, § 25–121,[7] specifically places limitations, through the licensing process, on minors' access to alcoholic beverages. The sale and consumption of alcoholic beverages are highly regulated areas of commercial activity. Public concern with alcohol abuse by teenagers is reflected in our drinking age laws. To undermine these efforts by *requiring* admission of minors to establishments serving meals as well as alcohol would fly in the face of these policies.

We conclude that the Board's finding, that the Godfather's policy of refusing admission to minors is contrary to law, was

---

**3.** D.C.Code 1973, § 47–2902(a) states:

It shall not be lawful for the keeper, proprietor, or proprietors of any licensed hotel, tavern, restaurant, ordinary, sample-room, tippling-house, saloon, or eating-house, to refuse to receive, admit, entertain, and supply any quiet and orderly person or persons, or to exclude any person or persons on account of race or color.

**4.** The statute includes the following:

The word "restaurant" means a suitable space in a suitable building, approved by the Boards, including such suitable space outside of the building and adjoining it as may be approved by the Board, kept, used, maintained, advertised, or *held out to the public* to be a place where meals are served . . . . [Emphasis added.]

**5.** Section 25–111(g) entitles the Board to issue a Class C license to a "bona fide restaurant"— "[one] held out to the public" pursuant to § 25–103(n).

**6.** 34 DCRR 15.1(a) states in part that

it shall be unlawful discriminatory practice [for a public accommodation] to do any of the following acts, wholly or partially for a

discriminatory reason based on the . . . age . . . of any individual:

(1) To deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . .

**7.** D.C.Code 1973, § 25–121 states in part:

Licenses issued hereunder shall not authorize the sale or delivery of beverages, with the exception of beer and light wines, to any person under the age of twenty-one years, or beer or light wines to any person under the age of eighteen years, either for his own use or for the use of any other person . . . . .

\* \* \* \* \* \*

No person being the holder of a license issued under section 25–111(l) shall permit on the licensed premises the consumption of alcoholic beverages, with the exception of beer and light wines by any person under the age of twenty-one years, or permit the consumption of beer and light wines by any person under the age of eighteen years . . . .

not in accordance with a reasonable construction of the law. D.C.Code 1978 Supp., § 1–1510(3)(A).

### III

Because of our conclusion regarding the minors issue, we are compelled to remand the instant case. In reaching this decision, we do not imply that the Board's determination as to the inappropriateness of the transfer of the Godfather's Class C license must necessarily fail. It is unclear whether the same determination would have been reached by the Board absent its findings relative to the barring of minors. Since an initial determination of the appropriateness of a liquor license transfer is committed to the expert discretion of the Board, we are not free to state whether the Board's determination in the instant case would have been different had the erroneous findings not been made. *Sherman v. Commission on Licensure to Practice the Healing Art,* D.C. App., 407 A.2d 595 (1979). *See SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Jameson's Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Board,* D.C.App., 384 A.2d 412 (1978); *Dietrich v. Tarleton,* 154 U.S.App. D.C. 47, 473 F.2d 177 (1972).

We therefore remand this case so that the Board may determine whether its decision regarding the inappropriateness of the transfer of the Godfather's liquor license ought to stand, absent consideration of the minors issue.

*So ordered.*

NEWMAN, Chief Judge, concurring:

The court today rules upon a narrow legal issue that decides both appeals concerning "The Godfather" restaurant. The Alcoholic Beverage Control Board declined to grant permission for the transfer of "The Godfather's" liquor license on the ground that "The Godfather" refused to serve minors. Subsequently the Board made reference to its previous opinion as one of the reasons for its refusal to renew "The Godfather's" license. This court, quite properly, has exposed the fundamental flaws in the Board's ruling on this legal issue and has remanded the matter to the Board for its further consideration. The license transfer case is dealt with in the court's opinion, and the license renewal case is dealt with in a parallel order. At this time, however, I believe it to be important to raise a separate issue not raised by the parties and thus not addressed by the majority opinion.

This court has repeatedly been called upon to decide, in a lengthening series of cases, whether there is "substantial evidence" to justify the findings of fact and conclusions of law of the Alcoholic Beverage Control Board in each given instance. We have heretofore, however, with the exception of one oblique reference, *see Jameson's Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Board,* D.C. App., 384 A.2d 412, 416 (1978), failed to address ourselves to the crucial predicate questions: (1) whether the criteria prescribed by the regulatory statute, D.C.Code 1973, § 25–115(a)(6), are sufficiently specific to pass constitutional muster when confronted with a challenge asserting a legislative delegation of unbridled administrative discretion, and (2) whether the factors which the Board has continually cited in differing weighted mixes in its decisions concerning the granting, renewal and transfer of liquor licenses, are logically derived from the statutory grant. The statute, D.C.Code 1973, § 25–115(a)(6) provides that:

.    .    .    .    .

(a) Before a license is issued the Board shall satisfy itself:

\*    \*    \*    \*    \*    \*

6. That the place for which the license is to be issued is an appropriate one considering the character of the premises, its surroundings, and the wishes of the persons residing or owning property in the neighborhood of the premises for which the license is desired.

### I

" 'If Congress shall lay down by legislative act an *intelligible principle* \* \* \*

such legislative action is not a forbidden delegation of legislative power.'" *Lichter v. United States,* 334 U.S. 742, 785, 68 S.Ct. 1294, 1316, 92 L.Ed. 1694 (1948) *quoting Hampton & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928) (emphasis added). In other words, there must not be a grant of "unbridled administrative discretion". *Woods v. Miller Co.,* 333 U.S. 138, 144–45, 68 S.Ct. 421, 92 L.Ed. 591 (1948).

The principle that authority granted by the legislature must be limited by adequate standards serves two primary functions vital to preserving the separation of powers required by the Constitution. *First,* it insures that the fundamental policy decisions in our society will be made not by an appointed official but by the body immediately responsible to the people. *Second,* it prevents judicial review from becoming merely an exercise at large by providing the courts with some measure against which to judge the official action that has been challenged.

The absence of standards under the Court's construction is an instructive illustration . . . whatever the Secretary decides to do, this Court will surely be unable effectively to review his actions, since it will not know what guides were intended by Congress to govern those actions. [*Arizona v. California,* 373 U.S. 546, 626, 83 S.Ct. 1468, 1511, 10 L.Ed.2d 542 (1963) (opinion of Harlan, J.) (footnote omitted).]

There are four fundamental values, three of which are highlighted by Justice Harlan, to be served by requiring the legislature to lay down adequate guidelines and standards when delegating power to an agency. First, adequate standards provide reassurance that the agency is in fact following the legislative mandate, and in administering the legislative will is staying faithful and responsive to the decision of the majority and to the democratic process. Second, definite standards provide those members of the citizenry who appear before or interact with the agency concerned with notice as to what will be required of them—in the instant case, with respect to what need be proven in order to qualify for a license renewal and/or license transfer. Without such notice, petitioners are liable to fall afoul of capricious and/or ad hoc administrative adjudication that has resulted from the lack of initial legislative guidance from the first. Third, lacking such standards and notice, the courts will be hard pressed to derive an acceptable standard for review from the statutory language. It is imperative that such a standard be provided in all instances, if the integrity of the judiciary is to be preserved. Fourth, and finally, the first three values directly implicate the need to protect the fourth value—that being the separation of power that is at the foundation of our American concept of government.

While the "delegation doctrine" is seen as moribund by many legal commentators, 1 K. Davis, Administrative Law Treatise § 2.01 (1958); B. Schwartz, Administrative Law §§ 11–18 (1976), the doctrine itself has never actually been rejected, and for good reason. Our society is one based on a tripartite form of government, each of the three branches balancing the others, each attaining power by a different path, each making certain that all of the many and varied interests of our increasingly complex society are represented. The Founding Fathers accepted the fact that one branch of government, the judiciary, had to be insulated from the democratic process, as a balance against the shifting alliances and vicissitudes of the political forum. But it was also clear that the concession was made with great reluctance. In a country predicated on democracy, republicanism, and majoritarian rule, there is not room for the establishment of yet another branch of government—an administrative branch—unresponsive to the will of the majority and that in many respects possesses the power to supersede the will of the popularly elected body, the legislature.

If our administrative agencies are to serve the function for which they were originally intended, and for which they are best suited—the carrying out of the legislative will—they must be given some measure

of guidance in performing their mission. The practice of delegating broad, unrestricted powers to administrative agencies must not, and cannot, be allowed to continue as an acceptable substitute for the fulfillment of the duly elected representative body's obligation to arrive at consensual decisions. The legitimacy of an agency is only maintained to the extent that it engages in carrying out the will of the legislature. To do that it is clear that the agency needs to be provided sufficient guidance and standards to enable it to discern, and implement, that legislative will. A statute so vague as to leave all discretion of the hands of the agency represents an abdication of the constitutional responsibility of the legislature. *See Panama Refining Co. v. Ryan,* 293 U.S. 388, 421, 55 S.Ct. 241, 79 L.Ed. 446 (1935). Regardless of what rules are formulated and promulgated by an agency, no matter how specific, if the delegating statute is too vague, it can never be said that the agency rules derive their legitimacy from the law, for the law, specific in application, cannot reliably be derived from grand generalizations that lack the ability to give guidance and direction. *See* Wright, *Beyond Discretionary Justice,* 81 Yale L.J. 575 (1972). Also, *see generally* Davis, *A New Approach to Delegation,* 36 Chi.L.Rev. 713 (1969); and Note, *Perfecting the Partnership: Structuring the Judicial Control of Administrative Determinations of Questions of Law,* 31 Vand.L.Rev. 91, 103–05 (1978).

## II

In the case before us we are confronted with a legislative delegation of power to the Alcoholic Beverage Control Board, charging that agency with the power to grant licenses to qualifying establishments who satisfy the standard of what is ". . . appropriate . . . considering the character of the premises, its surroundings, and the wishes of the persons residing or owning property in the neighborhood of the premises for which the license is desired." D.C. Code 1973, § 25–115(a)(6). The word "appropriate" is defined in Webster's Seventh New Collegiate Dictionary, 44 (14th ed.

1963), as meaning "especially suitable or compatible."

The qualifying clauses that follow the statutory standard provide little clarification of the word "appropriate" in this context, for a myriad number of social, physical, moral and political factors may be implicated in any given situation. What is "appropriate" may well be, in this instance, more a case of personal taste than of judiciously honed expertise.

It is true that a "[L]ack of precision is not itself offensive to the requirement of due process[,]" *Roth v. United States,* 354 U.S. 476, 491, 77 S.Ct. 1304, 1312, 1 L.Ed.2d 1498 (1957), for "[A] certain amount of imprecision is inherent wherever words are employed. . . . The Constitution [only] . . . require[s] . . . a reasonable degree of certainty." *Hicks v. District of Columbia,* D.C.App., 197 A.2d 154, 155 (1964) (footnotes omitted). It is also true that, as will be seen upon a reading of the case law, the Board has apparently come to rely on several criteria as being crucial to the determination of whether to grant, renew, or allow the transfer of liquor licenses. These criteria include: the location of the establishment seeking the license in an area zoned commercial or residential, *Citizens Association of Georgetown, Inc. v. District of Columbia Alcoholic Beverage Control Board,* D.C.App., (No. 13902, Sept. 19, 1979, slip op. at 4) (hereinafter cited as *Cit. Ass'n IV*); *Vestry of Grace Parrish v. District of Columbia Alcoholic Beverage Control Board,* D.C.App., 366 A.2d 1110, 1115 (1976); *Clark's Liquors, Inc. v. Alcoholic Beverage Control Board,* D.C. App., 274 A.2d 414, 418 (1971), the availability of parking and valet services, *Cit. Ass'n IV, supra;* *Vestry of Grace Parrish, supra* at 1115; *Citizens Association of Georgetown, Inc. v. District of Columbia Alcoholic Beverage Control Board,* D.C. App., 323 A.2d 715, 716 (1974) (hereinafter cited as *Cit. Ass'n III*); *Clark's Liquors, Inc., supra* at 416; *Sophia's Incorporated v. Alcoholic Beverage Control Board,* D.C. App., 268 A.2d 799, 800 (1970), the effect on local traffic conditions, *Cit. Ass'n IV, su-*

pra; *Citizens Association of Georgetown, Inc. v. District of Columbia Alcoholic Beverage Control Board*, D.C.App., 316 A.2d 865, 866 (1974), the size of the establishment, in particular its seating capacity, *Cit. Ass'n IV, supra*; *Vestry of Grace Parrish, supra* at 1115; *Citizens Association of Georgetown, Inc. v. Alcoholic Beverage Control Board*, D.C.App., 268 A.2d 801, 802 (1970) (hereinafter cited as *Cit. Ass'n I*); *Sophia's Incorporated, supra* at 800, the type of entertainment that will be offered on the premises, *Cit. Ass'n IV, supra*; *Vestry of Grace Parrish, supra* at 1115; *Sophia's Incorporated, supra* at 800, the arrangements for rubbish removal, *Cit. Ass'n IV, supra*; *Vestry of Grace Parrish, supra* at 1115; *Cit. Ass'n III, supra* at 716, the hours the establishment will remain open, *Cit. Ass'n IV, supra*; *Cit. Ass'n I, supra* at 802; *Sophia's Incorporated, supra* at 800, the proximity of private residences or institutions, such as schools and churches, where children may congregate or be present, *Vestry of Grace Parrish, supra* at 1115; *Clark's Liquors, Inc., supra* at 416, and the wishes of neighbors, *Vestry of Grace Parrish, supra* at 1115. From time to time the Board has attempted to implement new, previously unannounced criteria, such as the "uniqueness" of the establishment, *Palace Restaurant, Inc. v. Alcoholic Beverage Control Board*, D.C.App., 271 A.2d 561 (1970), in arriving at its determination. Though *Palace Restaurant, Inc., supra,* and its brethren were reversed, this stemmed from the fact that prior to public hearing there had been no announcement that such new criteria would be open to issue and might potentially be determinative. This court indicated that if proper announcement had been made, the introduction of such new criteria into the Board's proceedings would be within its proper administrative discretion.

The crux of the matter, however, is that a derivative, or agency standard cannot be delineated and applied unless and until the original, overarching legislative standard itself is made clear enough that the administrating agency can draw upon it for at least seminal guidance. Without that basic grounding in statutory law, both the general public and in particular petitioners coming before the administrative body can never be certain as to whether the criteria which are being used by the agency are derived, as the result of proper delegation, from the majoritarian will or are merely the result of the agency's unguided attempt to put administrative flesh on an ephemeral statutory skeleton.

The Alcoholic Beverage Control Board has merely incorporated the admittedly vague language of the governing statute into its rules and regulations, 3 DCRR 21.7, and promulgated those rules without further specificity. This leaves us with the reality that, to the extent the decisions of the Board do take on any order, that order is only the result of a long series of ad hoc, seemingly standardless adjudications. Query whether we can say with any degree of certainty that the standards which have emerged from such a formless evolution process bear more than a fortuitous connection with the original intent and purpose of the legislative body.

It may nonetheless be true that in situations where the agency sets out to limit and define its own mandate by adopting prospective rules to guide it in consideration of individual cases, the courts have some obligation to respect agency expertise. But when the agency has defaulted—when it purports to do no more than follow the vague statutory mandate without additional prospective rules of its own—the courts have no obligation to respect undemonstrated or hypothetical expertise. [Wright, Yale, L.J., *supra* at 596.]

In the present case we come full face with the twin defects of a vague, ambiguous statute delegating power under an ill-defined standard, and an administrative body that has done no more than incorporate that extremely vague statutory language, in full, into its rules and regulations without providing a clarifying administrative gloss of greater specificity. Petitioner, D. T., Inc., faces the challenge of satisfying an administrative board that has employed

continually changing criteria with respect to the various aspects and permutations of this litigation during the last four years. The controversy revolving about "The Godfather" has previously come before this court on three separate occasions. On each occasion the rulings of the Alcoholic Beverage Control Board have been overturned. The very vagueness of the statutory mandate delegating authority to the ABC Board has permitted this to occur given the absence of the necessary restraints ordinarily provided by legislative guidelines. Upon remand, the parties may choose to address the issue of whether D.C.Code 1973, § 25–115(a)(6) is an illegal delegation of power to the ABC Board, in that the guiding statutory precept is inherently vague and therefore, because of due process considerations, constitutionally defective.