**LEVELLE, INC., Petitioner,**

v.

**DISTRICT OF COLUMBIA ALCO-HOLIC BEVERAGE CONTROL BOARD, Respondent.**

No. 05–AA–765.

District of Columbia Court of Appeals.

Argued Jan. 30, 2007.

Decided May 17, 2007.

David W. Wilmot, with whom Andrea M. Bagwell, Washington, DC, was on the brief, for petitioner.

James C. McKay, Jr., Senior Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the brief was filed, and Todd S. Kim, Solicitor General, were on the brief, for respondent.

Before KRAMER and FISHER, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

This appeal challenges the revocation of a liquor license held by petitioner, Levelle, Inc., for an establishment located within a District of Columbia government-owned building in Northwest, Washington, D.C. Petitioner contends that the findings underlying the decision of the District of Columbia Alcoholic Beverage Control Board to revoke the license were not supported by substantial evidence and that the District should have been precluded from relying on evidence of events that took place prior to entry of an agreement between Levelle and the District of Columbia settling a landlord-tenant suit concerning the premises. We disagree and therefore affirm.

## I.

Petitioner Levelle, Inc. is a District of Columbia corporation that operated the Coach IV Restaurant, a.k.a. "Club U," within the Frank Reeves Municipal Center at 2000 14th Street, N.W. (hereinafter "the establishment" or "the club"). Prior to February 15, 2005, when its license was summarily suspended, petitioner held a Class "C/R" Retailer's License for the establishment that authorized petitioner to serve spirits, wine, and beer. *See* D.C.Code § 25–113(b)(3)(A)(i) (2001). After investigating the relationship between the operation of petitioner's establishment and numerous incidents of crime in and around the establishment, the District of Columbia Alcoholic Beverage Control Board ("the Board") revoked petitioner's license on June 29, 2005.

### *Statutory Background*

Pursuant to D.C.Code § 25–801 (2001), the Board has the authority to enforce the provisions of the "Alcoholic Beverage Regulation" title with respect to licensees. "The Board may suspend or revoke the license of any licensee during the license period if: (1) The licensee violates any of the provisions of this title, the regulations promulgated under this title, or any other laws of the District; [or] (2) The licensee allows the licensed establishment to be used for any unlawful or disorderly purpose...." D.C.Code § 25–823 (2001). Under D.C.Code § 25–827(a) (2001), "[t]he Chief of Police may request the suspension or revocation of a license if the Chief of Police determines that there is a correlation between increased incidents of crime within 1,000 feet of the establishment and the operation of the establishment. The determination shall be based on objective criteria, including incident reports, arrests, and reported crime, occurring within the preceding 18 months and within 1,000 feet of the establishment."

Before the Board may revoke or suspend a license, a licensee has a right to be heard pursuant to D.C.Code § 25–821 (2001), unless, as in this case, the summary revocation or suspension provisions of D.C.Code § 25–826 (2001) are invoked for situations in which "the operations of a licensee present an imminent danger to the health and safety of the public" or in which a patron assaults a police officer or other government official within 1,000 feet of the establishment.

## Factual Background

■ In 1999, the District of Columbia Office of Property Management sued petitioner, and petitioner countersued, both alleging breach of the lease contract for the space occupied by petitioner's establishment.[1] On December 16, 2004, petitioner and representatives of the District of Columbia executed a Settlement Agreement and Mutual Release ("Settlement Agreement" or "Agreement") to dispose of their respective claims. Under this Agreement, which expressed a "desire to fully and finally settle the Tenant's claims and the District's claims," petitioner was permitted to operate the establishment on weekdays from 7:00 a.m. until 3:00 p.m. and three evenings per week after 5:00 p.m. until a termination date of January 2, 2007.[2] Petitioner agreed to pay a one-time $100,000 "Settlement Payment"; pay a monthly rent of $2,916; and provide security for its evening events including "a minimum of two (2) security officers, use of the magnetometer as appropriate, and 100% ID check as appropriate." The District of Columbia, in exchange, agreed that "[t]he Office of Property Management will withdraw its protest with the Alcohol Control Board." The parties also executed a release from future actions relating to or arising from the claims in the lawsuit.[3]

While the landlord/tenant dispute was being litigated, and continuing after the execution of the Settlement Agreement, the establishment and the surrounding neighborhood experienced numerous incidents of violent crime. In particular, the club became a "focal point" for late-night problems on the weekends, according to the Chief of Police; it appears that the combination of large numbers of young people,[4] excited by alcohol, and the club's "go-go" atmosphere, created a volatile mix that the club's security was inadequate to control.

For example, on June 19, 2003, several female patrons were involved in a verbal altercation inside the club and were escorted outside, where one patron struck another patron in the head with a broken bottle, causing severe lacerations. Metropolitan Police Officers were flagged down to assist with the fight and crowd control, and two

---

1. The record on appeal does not contain any of the pleadings or orders from this previous litigation.

2. Because the revocation of a liquor license carries collateral consequences for the holder of that license, *see* D.C.Code § 25–821(c) (2001), this case still presents a live controversy despite the expiration of the establishment's lease. *Cf. Thorn v. Walker*, 912 A.2d 1192, 1195 (D.C.2006).

3. The release provided:

   Upon execution of the settlement agreement and receipt of payment required under this Agreement and Release, the District and the Tenant mutually agree to release and forever discharge the District, on one hand, and the Tenant, on the other hand, from any and all agreements, actions, cases, causes of action, claims, compromises, controversies, costs, damages, debts, demands, disputes, expenses, judgments, liabilities, pay-

ments, promises, and suits of any nature whatsoever, relating to, arising under, or in connection with the District's claims or the Tenant's claims in the above-referenced consolidated lawsuit, that they, or each of them individually, may have or may claim to have against each other which existed as of the effective date of the Settlement Agreement, [December 16, 2004,] except for such claims as may arise in the future relating to the enforcement of this Settlement Agreement and Release. The claims being released by the District and the Tenant include, but are not limited to, any claims for compensatory or punitive damages, attorneys' fees, court costs, or other expenses incurred by the District and Tenant, respectively, in connection with the District's and Tenant's claims.

4. The establishment's standing-room occupancy limit was four hundred eighty-eight persons.

arrests were made for assault. This incident was later investigated by the Board as Specification H to Charges I and II in the Notice to Show Cause issued to the establishment.[5] In other incidents, a male patron who left the club shot a person within 1,000 feet of the club on November 21, 2003, and a female patron assaulted a police officer after being ejected from the club on October 17, 2004; these incidents were later investigated by the Board as Specifications G and E, respectively, to Charge II in the Notice to Show Cause.

On November 10, 2004, the Chief of the Metropolitan Police Department ("MPD"), Charles Ramsey, sent the Board a letter pursuant to D.C.Code § 25–827(a) (2001) recommending the revocation of the club's alcohol license.[6] The letter stated that "[t]he area surrounding 'Club U' has been the focal point of several crimes" and detailed six events that "were directly related to, or occurred in front of 'Club U' during their hours of operation." The Chief stated that "[t]he number and severity of the criminal offenses occurring at and around 'Club U' leads me to conclude that the interests of the community would be best served if the license ... were revoked." The Board took no immediate action to suspend or revoke petitioner's license.

On February 13, 2005, a series of incidents occurred at or around the establishment that were later investigated by the

Board under several different specifications used to support Charges I and II of the Notice to Show Cause. In the incident at issue in Specification A of both charges, a male patron choked his girlfriend and punched a second female patron who tried to intervene, knocking her unconscious. The male patron was escorted out of the establishment, but the police were not notified. Ambulance personnel treated one victim at the scene and transported another victim to a hospital. According to Specification B of both charges, the male patron involved in Specification A returned to the scene and fired gunshots at the ambulance crew that was treating one of the assault victims referred to in Specification A. According to Specification C of both charges, on the same day a physical altercation broke out in the Reeves Center lobby between two male patrons as the establishment was closing, and the scene became chaotic as a large number of patrons tried to exit the establishment. Finally, according to Specification D of both charges, a patron who was being ejected from the club by security personnel was fatally stabbed inside either the club or the Reeves Center lobby, and the security officer assisting the bleeding patron had to step away to assist with the incident described in Specification C.

On February 14, 2005, following the incidents of the night before, the Chief of

5. As discussed below, Charge I of the Notice to Show Cause, dated March 14, 2005, alleged that petitioner had permitted the licensed establishment to be used for an unlawful or disorderly purpose in violation of D.C.Code § 25–823. Charge II alleged that the licensed establishment was the subject of a request for revocation of its license by the Chief of the Metropolitan Police Department, pursuant to D.C.Code § 25–827, based on a determination that there was a correlation between increased incidents of crime within 1,000 feet of the establishment and the operation of the establishment.

6. D.C.Code § 25–827(a) provides:

The Chief of Police may request the suspension or revocation of a license if the Chief of Police determines that there is a correlation between increased incidents of crime within 1,000 feet of the establishment and the operation of the establishment. The determination shall be based on objective criteria, including incident reports, arrests, and reported crime, occurring within the preceding 18 months and within 1,000 feet of the establishment.

Police sent another letter to the Board pursuant to D.C.Code § 25–827 recommending the revocation of the club's license. In this letter, the Chief stated: "I am strongly recommending that Club U ABC's [sic] license be permanently revoked based on yesterday's homicide and the two other homicides that can be linked to Club U.... This club should be permanently shut down for the safety and security of the people who go to Club U and live nearby."

On February 15, 2005, the Board invoked its summary procedures pursuant to D.C.Code § 25–826 to suspend petitioner's license. The Board held hearings on the suspension and on March 14, 2005, issued a notice to show cause why petitioner's license should not be revoked. The notice to show cause included multiple charges directed at the petitioner, each supported by several specifications that detailed individual incidents. Charge I alleged that petitioner had allowed the licensed establishment to be used for an unlawful or disorderly purpose, in violation of D.C.Code § 25–823(2). Charge II alleged that the licensed establishment was the subject of a request for revocation of its license by the Chief of the Metropolitan Police Department, pursuant to D.C.Code § 25–827, based on a determination that there was a correlation between increased incidents of crime within 1,000 feet of the establishment and the operation of the establishment. Charge III alleged that petitioner had served an alcoholic beverage at the licensed establishment to a person who was or appeared to be intoxicated, in violation of D.C.Code § 25–781(a)(2). Finally, Charge IV alleged that petitioner had allowed the consumption of an alcoholic beverage at the licensed establishment by a person who was or appeared to be intoxicated, in violation of D.C.Code § 25–781(b)(2).

After additional hearings on the revocation of petitioner's license, the Board issued, on June 29, 2005, its Findings of Fact, Conclusions of Law, and Order in which the Board concluded that Charges III and IV had not been proven, but found that Charges I and II were sustained by the evidence. Based on this determination, the Board concluded that revocation of petitioner's license was warranted.

## II.

In this appeal, petitioner challenges the findings and conclusions of the Board, contending that they were not supported by substantial evidence and that the Board erred in considering incidents that occurred prior to the execution of the Settlement Agreement. We conclude that the Board's findings were supported by substantial evidence and that the Board did not err in considering pre-agreement incidents, and we therefore affirm the decision of the Board to revoke petitioner's Class "C/R" Retailer's License.

This court reviews with deference the factual findings of the Board, reversing only if the findings are not based on substantial evidence in the record as a whole. *See* D.C.Code § 2–510(a)(3)(E) (2001); *Tiger Wyk Ltd. v. District of Columbia Alcoholic Beverage Control Bd.*, 825 A.2d 303, 307 (D.C.2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tiger Wyk Ltd.*, 825 A.2d at 307 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). We review the legal conclusions of an agency de novo. *Harris v. District of Columbia Office of Worker's Comp.*, 660 A.2d 404, 407 (D.C. 1995). This court will accord considerable weight to an agency's construction of the statutes and regulations that it administers where the meaning of the language is not clear on its face; however, "the judiciary is

the final authority on issues of statutory construction." *Id.*

■ Based on our review of the record, we conclude that there was substantial evidence to support the Board's conclusion with regard to Charge I of the notice to show cause: that petitioner had permitted the licensed establishment to be used for an unlawful or disorderly purpose in violation of D.C.Code § 25–823. This charge was supported by Specification H, arising from an incident on June 19, 2003, and Specifications A, B, C, and D, arising from separate incidents on February 13, 2005.

With regard to Specification H, the incident in which one patron assaulted another with the broken bottle, the Board heard the testimony of two police officers who investigated the incident, Officer Green and Detective Hewick. The Board concluded that the incident was the result of the security staff's ineffective handling of a relatively-minor altercation and the club's ill-advised practice of ejecting the participants of an altercation without notifying the police.

With regard to Specifications A, B, C, and D, the Board heard testimony from Stevland Joppy, a member of the club's security staff; Kerry A. Payne, Deputy Operations Chief of the District of Columbia Emergency Management Agency, which is located on the 8th floor of the Reeves Center; and Gerald M. Wilson, Chief of the District of Columbia Protec-

tive Services Division, which provides security for certain parts of the Reeves Center. This testimony provided substantial support for the Board's findings that (a) a male patron choked one female patron and struck another; (b) the same male patron shot at the personnel of an ambulance who were treating a female patron; (c) there was a physical altercation between two male patrons and a large commotion among patrons trying to exit the club; and (d) a male patron was fatally stabbed at or near the club entrance. This testimony also provided substantial support for the findings that there was "inadequate staffing or supervision at [the] establishment to prevent the disorder that ensued;" that petitioner was incapable of adequately and safely moving patrons in and out of the establishment; and that petitioner followed an unwise practice of ejecting from the establishment patrons who were involved in criminal activity, including assaults, without notifying the police.

■ Petitioner contends that it cannot be held responsible for the unlawful acts of third persons who figured in this case. To the contrary, an "unlawful or disorderly purpose" under D.C.Code § 25–823 can be imputed to a licensee who engages in a "method of operation" that is conducive to unlawful or disorderly conduct. *See Am-Chi Restaurant v. Simonson,* 130 U.S.App. D.C. 37, 38–39, 396 F.2d 686, 687–88 (1968); *4934, Inc. v. Washington,* 375 A.2d 20, 22–23 (D.C.1977).[7] In applying § 25–

---

**7.** In *Am-Chi Restaurant,* the United States Court of Appeals for the District of Columbia Circuit affirmed the revocation of a license under D.C.Code § 25–118 (1967) (re-codified in 2001 at D.C.Code § 25–823), based on the establishment's use for an unlawful purpose (prostitution), where the appellant's "method of operation"—employing off-stage dancers to sit with customers at individual tables and persuade them to order additional drinks—"continued over time, harbored sufficient danger of mischievous consequences sooner or later." 130 U.S.App.D.C. at 38–39, 396

F.2d at 687–88. On the other hand, in *4934, Inc.,* this court vacated the suspension of a license under D.C.Code § 25–118 (1973), based on the establishment being used for an unlawful purpose (indecency), "in the absence of any evidence showing a continuous course of conduct" by appellant or any other " 'method of operation' which encouraged the sort of performance deemed illegal by the arresting officers." 375 A.2d at 22–23. The fact that *Am-Chi* and *4934, Inc.* addressed the unlawful conduct of employees does not dispositively distinguish those cases from the in-

823 in the present case, it is apparent that the Board operated under a similar understanding of the scope of the statute-which is one that the Board is charged with administering. *See* D.C.Code § 25–801 (2001). We agree that this construction is reasonable and consistent with the language of § 25–823, and thus we defer to the Board's reading of the statute. *See Harris, supra,* 660 A.2d at 407.

In the present case, the Board relied only on incidents that had a demonstrable connection to the operation of the establishment; significantly, the Board made factual findings not only about what occurred, but also about how the club's regular method of operating caused or contributed to the incidents. For example, the Board concluded that various incidents were attributable to the lack of training and supervision of petitioner's security staff, the failure of petitioner to maintain a sufficient number of security personnel, the inadequacy of petitioner's security plan, petitioner's failure to fully enforce its security procedures, and petitioner's failure to properly communicate with police about incidents. These are the types of omissions that are conducive to an unlawful and disorderly environment, and were indeed found to have caused or aggravated the disorderly conduct for which the club was cited. Under the circumstances, we conclude that there was sufficient evidence for a reasonable person to conclude that the club's method of operation caused the licensed establishment to be used for an

unlawful or disorderly purpose, and therefore we uphold the findings underlying the revocation of petitioner's license under Charge I.[8] *See Am–Chi Restaurant, supra,* 130 U.S.App.D.C. at 38–39, 396 F.2d at 687–88.

■ With regard to Charge II of the notice to show cause, based on our review of the record, we are satisfied that the Board relied on substantial evidence in concluding, as had the Chief of Police, that there was "a correlation between increased incidents of crime within 1,000 feet of the establishment and the operation of the establishment." *See* D.C.Code § 25–827(a). Charge II was supported by the same specifications, A, B, C, D, and H, that supported Charge I, along with Specification G, arising from an incident on November 21, 2003, and Specification E, arising from an incident on October 17, 2004.

As discussed above, Specifications A, B, C, D, and H of Charge I all involved incidents that occurred within 1,000 feet of the establishment and that were directly traceable to the operation of the establishment. These specifications were incorporated by reference in Charge II. In addition, the Board concluded that Charge II was supported by two other specifications, Specifications G and E. Specification G, involving a November 21, 2003, incident in which a patron's consumption of alcohol at the club played a role in that patron's later shooting of another person within 1,000 feet of the establishment, was supported

---

stant case; under D.C.Code § 25–823, the focus remains on the method of operation of the *establishment* which caused or contributed to the unlawful or disorderly conduct of the third persons and from which an unlawful or disorderly purpose can be imputed to the establishment.

8. The Board considered evidence of several additional incidents that occurred in or around the establishment, but concluded that there was an insufficient link to petitioner's

method of operations to hold petitioner accountable for the incidents under Charge I. These incidents included the fatal shooting of one patron by another patron within 1,000 feet of the establishment on March 16, 2003 (Specification I); the fatal stabbing of a patron after he left the club on September 17, 2004 (Specification F); and a female patron's assault on a police officer after the patron refused to leave the club on October 17, 2004 (Specification E).

by the testimony of MPD Inspector Diane Groomes, MPD Homicide Detective Pamela Montague, Officer Frank Murga of the D.C. Protective Services Division, and private investigator (and former MPD detective) Trevor Hewick. Specification E, involving an October 17, 2004, incident in which a female patron assaulted a police officer after refusing to leave the area after being ejected from the club, was supported by the testimony of MPD Officer Sean Hill, MPD Sergeant Anthony Moye, club security officer Stevland Joppy, and Latisha Martin, the patron who committed the assault.

■ After reviewing these incidents, the Board determined that there was a "correlation between the operation of the establishment and incidents of crime within one thousand feet" and noted that, as a result, the Metropolitan Police Department had been forced to allocate additional manpower to petitioner's location. We are satisfied that the Board's findings with regard to Charge II were based on substantial evidence, and thus the revocation of petitioner's license was not in error.[9]

## III.

■ Finally, we address petitioner's argument that the 2004 Settlement Agreement precluded the Board from considering events that occurred prior to the execution of the Settlement Agreement. The Board concluded that the Settlement Agreement "did not immunize the Respondent from the charges contained in the March 14, 2005 Notice to Show Cause because the claims raised in the civil lawsuit were separate and distinct from the charges presented in the March 14, 2005 Notice to Show Cause."

■ Petitioner has failed to demonstrate that the Board erred when it reached this conclusion. Based on our review of the agreement, a copy of which was included in the record on appeal, the release between the parties applied only to actions and other matters "relating to, arising under, or in connection with the District's claims or the Tenant's claims in the above-referenced consolidated lawsuit." However, petitioner never presented to the Board any of the pleadings from the prior suit to create a record of the "claims" in the referenced lawsuit and thereby inform the Board's understanding of the Settlement Agreement. "Where a party to an administrative dispute has been given a fair opportunity to present evidence and make his contentions in administrative proceedings, with rare exceptions he will be bound by the record there made." *Williams v. Robinson*, 139 U.S.App. D.C. 204, 209, 432 F.2d 637, 642 (1970) (footnote omitted); *see also Cohen v. Rental Hous. Comm'n*, 496 A.2d 603, 605–06 (D.C.1985) (discussing a petitioner's "duty to present this court with a record sufficient to show affirmatively that

---

9. In its reply brief, petitioner contends that D.C.Code § 25–827(a), which deals with the correlation between the operation of an establishment and increased incidents of crime within one thousand feet thereof, authorizes the Chief of Police to request the suspension or revocation of a license but does not provide an independent basis for the suspension or revocation. Although this contention arguably may have merit, we need not consider it on this appeal, as petitioner conceded at oral argument that the argument was raised for the first time in this case in the reply brief.

We generally do not consider arguments on appeal that were not raised before the agency, *see Bannum, Inc. v. District of Columbia Bd. of Zoning Adjustment*, 894 A.2d 423, 432(D.C.2006), nor do we allow new arguments to be made in a reply brief, *see Johnson v. District of Columbia*, 728 A.2d 70, 75 n. 1(D.C.1999). Consequently, we decline to consider whether D.C.Code § 25–827(a) provides an independent ground for revocation and assume for purposes of this litigation that it does provide such a ground.

error occurred") (citation omitted); D.C.Code § 2–510(a) (2001) ("The Court [of Appeals] shall hear and determine all appeals upon the exclusive record for decision before the Mayor or the agency."). The Board was thus in a position, as is this court, to consider only the testimony of petitioner's settlement counsel that the parties "were suing each other for breach of the lease contract." A release from such landlord-tenant claims seems far afield from the broad immunity that petitioner now claims was agreed upon.

We also are not persuaded by petitioner's argument that an intent to limit the Board's enforcement power with regard to incidents in this case may be inferred from OPM's agreement to withdraw its protest to the Board opposing the renewal of petitioner's license. On the record before this court, we have no basis to conclude that the protest even involved any of the same incidents underlying the Board's enforcement action; according to the testimony of appellant's settlement counsel, the OPM protest was filed at least "in part because of the breach of lease issues that were unsolved but subject to the civil lawsuit that was pending." Furthermore, not only is a protest action—which may be filed by a citizen, group, or government official pursuant to D.C.Code §§ 25–601, –602—a separate and distinct matter from an enforcement action by the Board under

D.C.Code § 25–823, but the OPM protest in this case also originated as a separate matter from the "parallel" landlord-tenant lawsuit that gave rise to the mutual release provision of the Settlement Agreement, as petitioner acknowledges in its brief.

Based on the limited record of the claims and protest that we have before us, we cannot conclude that the mutual release provision relating to the "claims" of the lawsuit even barred OPM from renewing its protest to the Board, much less barred the Board itself from undertaking future enforcement action. Thus, we are satisfied that petitioner has not demonstrated that the Board erred when it concluded that the Settlement Agreement did not bar the Board's consideration of prior events.[10] Accordingly, the revocation of petitioner's Class "C/R" Retailer's License is affirmed.

*So ordered.*

---

10. From our review of the record, we cannot discern when, if ever, petitioner raised before the agency the theory of equitable estoppel that petitioner asserts before this court. In any event, petitioner's claim of estoppel is without merit. "Estopping a municipality from enforcing the law must be, at best, the rare exception, not the rule." *Rafferty v. District of Columbia Zoning Comm'n*, 583 A.2d 169, 175 (D.C.1990). Because the Settlement Agreement applied only to matters arising from the "claims" in the previous lawsuit, the District took no "affirmative act" to imply a grant of full immunity to the petitioner, and petitioner's reliance on an interpretation of the agreement that was broader than the agreement itself was not "justifiable and reasonable." *See id.* Furthermore, petitioner has not alleged "expensive and permanent improvements" made in "good faith" reliance on its perceived immunity; the $100,000 settlement for breach of the lease, the $2,916 monthly rent payments, and the hiring of twenty-five security personnel all related to past debts or present operating expenses, not permanent investments in the future. *Cf. id.* (discussing petitioner's building of an addition to a house). Petitioner thus has not demonstrated that equitable estoppel is available or appropriate in this situation.