**1900 M RESTAURANT ASSOCIATIONS, INC., t/a Rumors Restaurant, Petitioner,**

v.

**DISTRICT OF COLUMBIA ALCOHOLIC BEVERAGE CONTROL BOARD, Respondent.**

**No. 11–AA–245.**

District of Columbia Court of Appeals.

Argued March 6, 2012.

Decided Nov. 29, 2012.

might be thought implicit in the word "maintain."

Christopher B. Mead, with whom Mark London, Washington, and Scott H. Rome, Laurel, MD, were on the brief, for petitioner.

Richard S. Love, Senior Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for respondent.

Before WASHINGTON, Chief Judge, GLICKMAN, Associate Judge, and REID, Senior Judge.

WASHINGTON, Chief Judge:

This appeal challenges the imposition of a fine and suspension of a liquor license held by petitioner, 1900 M Restaurant Associates, Inc., for the establishment Rumors Restaurant ("Rumors"). Petitioner argues that the findings underlying the decision of the District of Columbia Alcoholic Beverage Control Board ("ABC Board" or "Board") to impose the fine and suspend its license were not supported by substantial evidence.[1] We agree and therefore reverse.

## I.

Petitioner is the holder of a nightclub Class C/N license. *See* D.C.Code § 25-113(d)(2)(A) (2001). Based on three incidents in 2009 at petitioner's establishment, Rumors, petitioner received notice of eleven violations of the District of Columbia's liquor licensing laws. The ABC Board held a hearing, at which the District introduced evidence and witness testimony relating to each of the incidents. A summary of the three incidents follows.

### January Incident

The government presented evidence that on January 4, 2009, Ryan Saltzman and his brother Adam were patrons at Rumors. The two were dancing on the crowded dance floor at around 2:30 a.m. when Evan Polley, a Rumors security employee, who was sitting near the brothers made a "shooing" gesture towards them. The brothers did not know what the gesture meant or who Polley was, as Polley wore nothing identifying himself as an employee of Rumors or as a member of the security staff. Ryan testified that he saw a woman standing next to Polley, and that Polley then told the brothers to move without explaining why or identifying himself. The brothers again ignored Polley because they thought he was drunk and they did

---

1. The Board found the petitioner violated three provisions of D.C.Code § 25–823, which provide:

    The Board may fine ... and suspend, or revoke the license of any licensee during the license period if:

    ...

    (2) The licensee allows the licensed establishment to be used for any unlawful or disorderly purpose;

    ...

    (5) The licensee fails or refuses to allow an ABRA investigator, a designated agent of ABRA [Alcoholic Beverage Regulation Administration], or a member of the Metropolitan Police Department to enter or inspect without delay the licensed premises or examine the books and records of the business, or otherwise interferes with an investigation; or

    (6) The licensee fails to follow its voluntary agreement, security plan, or Board order.

    D.C.Code § 25–823(2), (5)-(6) (2011 Supp.).

not realize that he was a Rumors security employee.

Polley repeated himself, and after a third time, began pushing Ryan and grabbed his shoulders and upper arms. Ryan attempted to get Polley off of him, and Polley responded by pulling Ryan's jacket over his head. Ryan felt himself being grabbed and pushed outside of the restaurant. Ryan tried to re-enter to help his brother, but the security guard posted at the door would not let him inside. A minute or two later, Adam came outside with ripped clothing and in tears. Adam had apparently tried to help his brother, but his arms were pinned behind his back by another person. Polley allegedly kneed Adam in the face and punched him in the back of the head. Adam suffered a broken or fractured nose as a result of the incident. Ryan called the police, and Polley was arrested.

Polley was subsequently charged with assault of Adam Saltzman. He was tried in Superior Court, and was found to have been acting in self-defense. Over the government's objection, the ABC Board considered Polley's trial testimony in which he explained that on the night in question, a female customer, who was a regular Rumors patron, was dancing near the brothers and suddenly moved aggressively towards them. Polley testified that he grabbed her by the shoulders, pulled her back, and told her to calm down. A minute later, she again moved aggressively towards the brothers and pushed one of them. Polley did not know why the woman was upset, and testified that he took her into the dining room and sat her down. He then went back to the brothers and told them that they had to leave, but one of the brothers responded that they did not have to do what he said. Polley testified that he identified himself as an employee of Rumors, and then grabbed the back of their jackets.

### April Incident

The government also presented evidence that on April 4, 2009, Daniel Blakely was a patron at Rumors, where he was joined by seven of his friends. Blakely had been at Rumors for about an hour when a fight broke out between one of his friends and another customer. Blakely took two steps towards the fight to prevent his friend from being thrown to the ground. At that moment, Blakely saw an arm extend and smash a bottle against his head. He touched his forehead and saw blood on his hand. Another customer saw that Blakely was bleeding and took him to the restroom. When Blakely returned from the restroom, he was still bleeding and had glass in his hair. At this point, Blakely's friends had been ejected from the restaurant. Blakely saw an employee cleaning glass (what appeared to be a broken beer bottle) from the floor. He asked to speak to the manager twice before Paul Kolokousis appeared and asked to see the surveillance video in order to identify who had hit him. Kolokousis told Blakely that the footage could not be viewed that night because it was stored off-site.

The Alcoholic Beverage Regulation Administration ("ABRA") received a complaint filed by Blakely's father regarding the alleged assault as well as a police report of the April 4 incident from the D.C. Metropolitan Police Department ("MPD"). ABRA Investigator Erin Mathieson visited Rumors on April 15, 2009, to conduct a regulatory inspection. Mathieson interviewed Mike McGrabbin, a member of the Rumors security staff. Mathieson asked McGrabbin whether he was familiar with Rumors' security guidelines, and showed him a copy of Rumors' security plan. McGrabbin indicated that he had never before seen the security plan.

Mathieson also interviewed Anthony Palmer, an ABC manager at Rumors, who told Mathieson that the manager, Kolokousis, would not be available until April 17. Mathieson left her business card with Palmer and told him that she needed the security video footage from April 3 to April 4, 2009. On the card, she wrote that she needed the footage by a certain date.

Mathieson returned to Rumors on April 17 because she had not been contacted by Kolokousis. Kolokousis recalled the April 4 incident, and told Mathieson that Blakely head butted another person when he was trying to help his friend. Kolokousis also told Mathieson that he had viewed the security video footage from April 4, and could not see anything from the incident on the tapes. Kolokousis told Mathieson that Palmer had failed to relay the investigator's message regarding the footage. Mathieson gave Kolokousis her business card and asked that he provide her with the names and telephone numbers of all security staff involved in the April 4 incident.

On April 24, Mathieson telephoned Kolokousis, as she had not yet heard back from him. Kolokousis said he would provide Mathieson with a DVD of the footage and the requested contact information by April 28. Mathieson did not hear from Kolokousis, so on April 28, she called him again. Kolokousis then informed Mathieson that he could not furnish the requested video footage because the videotapes rerecord every seven days, but provided her with the names of two members of the security staff who were involved in the April 4 incident.

### August Incident

The government then presented evidence that on August 1, 2009, MPD Detective Tabron responded to an assault complaint at Rumors. According to Tabron, a man and woman had ordered drinks. When the couple tried to pay their tab, they did not agree with the bill. The bartender, Yusef "Joe" Khalil, assumed the remaining balance himself and asked the couple to leave.

Instead of leaving, the couple approached Kolokousis. They asked him if he was the manager, to which Kolokousis replied yes. Then Khalil approached, screaming, and told the couple to leave. Khalil pushed the woman and grabbed the man, putting him in a choke hold. The U.S. Attorney's Office ultimately declined to prosecute Khalil. He was reprimanded by management, and continued to work at Rumors after the August 1 incident. Khalil was considered one of the best bartenders at Rumors, as he had a large following.

### ABC Board's Order

The ABC Board convened a hearing on September 22 and November 18, 2010. Through a written order dated February 17, 2011, the ABC Board found that petitioner had committed five of the eleven charged violations and fined petitioner as well as suspended the establishment's license.

First, regarding the January incident with the Saltzman brothers, the ABC Board concluded that petitioner violated D.C.Code § 25–823(2) (2011 Supp.) because its "security practices were inadequate and unnecessarily endangered the establishment's employees and patrons." Specifically, the Board found that petitioner had allowed its establishment to be used for an unlawful or disorderly purpose "based on the establishment's failure to issue proper security uniforms, as indicated in its March 2008 security plan and the actions of Mr. Polley." The Board found that petitioner's "failure to provide proper uniforms ... for over one year contributed

to the confusion that led to Adam Saltzman's injuries...." The Board also concluded that petitioner "encourages or, at the very least, does not dissuade its security personnel from being overly aggressive with unruly patrons," and that there was no need for Polley to have grabbed the Saltzman brothers, but that petitioner's "lax security training created an atmosphere that encourages its bouncers to touch patrons unnecessarily."

Second, regarding the August incident involving bartender Khalil, the Board concluded that petitioner again violated D.C.Code § 25–823(2) "by failing to properly discipline and supervise its employees and creating an atmosphere conducive to [the initiation of] violence." The Board explained that, "[a] '1–assault free' employment policy endangers all of the establishment's patrons and sets a terrible precedent for the establishment's other employees."

Third, regarding the January incident, the Board concluded that petitioner failed to adhere to section 7 of its security plan, and thus violated D.C.Code § 25–113(d)(1) (2011 Supp.). Section 7 of Rumors' security plan states, "[i]f for some reason [a patron] is not satisfied with [the security staff's] handling of their situation, assure them that a manager will be with them in a moment to further assist them and evaluate any problems that may remain." The Board found that based upon this language in the security plan, "Polley should have obtained a manager when the Saltzman brothers failed to follow his commands," and should have instead ejected the woman who was acting aggressively towards the brothers.

Fourth, regarding Investigator Mathieson's April interview of McGrabbin, a member of Rumors' security staff, the Board concluded that petitioner failed to adhere to section 1 of its security plan, and therefore again violated D.C.Code § 25–113(d)(1). Section 1 of Rumors' security plan states that an applicant for employment as a member of Rumors' security team "will ... interview with [Rumors'] head of security and review our security packet to make certain their duties and our expectations of the security staff are understood." The Board "presume[d] that a security member who has never seen the establishment's security plan has never reviewed or is familiar with the security plan."

Fifth, and finally, regarding the April interactions between Investigator Mathieson and the manager Mr. Kolokousis, the Board concluded that petitioner failed to allow Mathieson "to examine its security footage without delay" in violation of D.C.Code § 25–823(5) (2011 Supp.).[2] The Board explained that it allows reasonable delays, "but delays based on the failure of [Rumors'] agents to communicate ABRA's requests for access to their books and records, because they are too busy, or do not know how to access the records are unacceptable." The Board found that petitioner's "actions amount to gross disregard of its legal obligations," despite the fact that the Board credited petitioner's testimony that the footage was of minimal value to the investigation.[3]

For all five violations, the fines assessed totaled $9,000.00, and the suspension of Rumors' license totaled nineteen days, with seven days to be served and twelve days stayed for one year, provided that

---

**2.** The Board's Order conclusively states that "books and records" as contained in § 25–823(5) includes security footage, without discussion or analysis.

**3.** The Board determined that the fact that the video footage no longer existed by the time Mathieson requested it was irrelevant.

Rumors committed no ABC violations during that time.[4] Petitioner filed a motion for stay pending appeal, which the Board granted.

## II.

Petitioner argues that the ABC Board improperly concluded that petitioner allowed Rumors to be used for an unlawful or disorderly purpose both as to the January incident involving the Saltzman brothers and the August incident involving bartender Khalil.

"This court reviews with deference the factual findings of the [ABC Board], reversing only if the findings are not based on substantial evidence in the record as a whole." *Levelle, Inc. v. District of Columbia Alcoholic Beverage Control Bd.*, 924 A.2d 1030, 1035–36 (D.C.2007) (citing D.C.Code § 2–510(a)(3)(E) (2001)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tiger Wyk Ltd. v. District of Columbia Alcoholic Beverage Control Bd.*, 825 A.2d 303, 307 (D.C.2003). However, "[w]e review the legal conclusions of an agency de novo." *Levelle*, 924 A.2d at 1035. "This court will accord considerable weight to an agency's construction of the statutes and regulations that it administers where the meaning of the language is not clear on its face; however, the judiciary is the final authority on issues of statutory construction." *Id.* at 1035–36 (internal quotation marks omitted).

D.C.Code § 25–823(2) states, "[t]he Board may fine … and suspend, or revoke the license of any licensee during the license period if: [t]he licensee allows the licensed establishment to be used for any unlawful or disorderly purpose." [5] Looking to the legislative history, the congressional debates leading to the enactment of this post-Prohibition provision evince a concern with not permitting "the return of the saloon," and an interest in encouraging temperance. 73 CONG. REC. 263–94 (1934). Later amending this statute, Council of the District of Columbia ("D.C. Council") indicated that, "[t]he intent is to permit ABC license sanctions to be imposed against licensees who are determined, in the relevant administrative, civil, or criminal proceedings, to have violated District laws or regulations." D.C. COUNCIL, REPORT ON BILL 6–217 at 52 (Nov. 12, 1986). "It is not the intent of this provision to allow suspensions or revocations in the case of occasional, minor code violations. But a consistent pattern of violations, demonstrating a flagrant disregard for the public safety and welfare, would justify the initiation of suspension or revocation proceedings." *Id.*

We have had limited occasion to review the question of whether a licensee's conduct constitutes allowing the use of an establishment for an unlawful or disorderly purpose. Our cases discussing this matter begin with the D.C. Circuit's interpretation in *Am–Chi Rest., Inc. v. Simonson*,

---

4. The fine assessed and suspension imposed for each violation are as follows. Violation one: fine of $2,000.00 and suspension for five days, with two days served and three stayed. Violation two: fine of $4,000.00 and suspension for five days, with two days served and three stayed. Violation three: fine of $500.00 and suspension for two days, both days stayed. Violation four: fine of $500.00 and suspension for one day, stayed. Violation five: fine of $2,000.00 and suspension for six days, with three days served and three stayed.

5. D.C.Code § 25–823(2) was previously codified at D.C.Code § 25–118 (1967), which provided for license suspension or revocation if the licensee "allow[ed] the premises to be used to any unlawful, disorderly, or immoral purpose."

396 F.2d 686 (D.C.Cir.1968),[6] where the ABC Board concluded that the licensee had allowed its restaurant to be used for an unlawful purpose when it permitted a female employee (an exotic dancer) to solicit a customer (an undercover officer) for the purpose of prostitution. The D.C. Circuit upheld the Board's license revocation order on the basis that the restaurant's "method of operation, continued over time, harbored sufficient danger of mischievous consequences sooner or later to permit such assignment of responsibility for the tawdry incidents when and if they take place." *Id.* at 688. The court reasoned that although no evidence of prior solicitations was introduced, "[i]t is enough that the employee's regular duties required verbal intercourse with unattached patrons, that the atmosphere provided by the employer was at least conducive to the initiating of arrangements for post-prandial intercourse of another kind." *Id.*

We then addressed this question in *4934, Inc. v. Washington,* 375 A.2d 20 (D.C. 1977), where the ABC Board concluded that the licensee had "unlawfully and knowingly present[ed] and otherwise participate[d] in the preparation of an obscene, indecent and filthy performance" by a female employee, who performed a provocative dance in the presence of three plainclothes officers. *Id.* at 22. Relying on *Am–Chi,* we vacated the Board's order "in the absence of any evidence showing a continuous course of conduct to sustain the finding that the licensee had adopted a 'method of operation' which encouraged the sort of performance deemed illegal by the arresting officers." *Id.* at 22–23.

Our only other occasion to review this issue arose thirty years later in *Levelle,* 924 A.2d at 1037, where we affirmed the

Board's order revoking petitioner's license because the Board's conclusion that petitioner permitted its establishment to be used for an unlawful or disorderly purpose was supported by substantial evidence. In that case, "the Board relied only on incidents that had *a demonstrable connection to the operation of the establishment," id.* (emphasis added), to make findings about how the club's regular method of operating caused, contributed to, or aggravated the disorderly conduct. Specifically, the Board found that "there was inadequate staffing or supervision at [the] establishment to prevent the disorder that ensued; that petitioner was incapable of adequately and safely moving patrons in and out of the establishment; and that petitioner followed an unwise practice of ejecting from the establishment patrons who were involved in criminal activity, including assaults, without notifying the police." *Id.* at 1036.

As each of these cases demonstrates, and the legislative history indicates, the relevant inquiry for this court to consider in reviewing the ABC Board's conclusion that a licensee allowed its establishment to be used for an unlawful or disorderly purpose is whether there is substantial evidence of a course of conduct, continued over time, that reflects the licensee's adoption of a pattern or regular method of operation that encouraged, caused, or contributed to the unlawful or disorderly conduct at issue. The evidence upon which the Board rests its conclusion must have a "demonstrable connection" to the establishment's operation. *Id.* at 1037. In the absence of evidence of a continuous course of conduct, it may be sufficient that the licensee's method of operation created an environment that fostered or was condu-

6. We are bound by opinions of the D.C. Circuit preceding February 1, 1971. *M.A.P. v.* *Ryan,* 285 A.2d 310, 312 (D.C.1971).

cive to the unlawful or disorderly conduct that inevitably took place. *See Am–Chi,* 396 F.2d at 687–688; *4934, Inc.,* 375 A.2d at 22.

■ In this case, the Board concluded that petitioner allowed Rumors to be used for an unlawful or disorderly purpose first, because its "security practices were inadequate and unnecessarily endangered the establishment's employees and patrons," and second, "by failing to properly discipline and supervise its employees and creating an atmosphere conducive to [the initiation of] violence." However, there is no evidence on this record of a continuous course of conduct indicating that petitioner adopted a method of operation that encouraged, caused, or contributed to the endangerment of Rumors employees and patrons, or to the creation of an atmosphere conducive to violence. Instead, here, all that was presented was evidence of two isolated, unrelated incidents of violence occurring at the establishment, which even if considered together, fail to establish evidence of a continuous course of conduct. The first incident occurred in January and involved a physical confrontation between the Saltzman brothers and Polley, in which Polley failed to wear a shirt or hat identifying himself as a member of Rumors' security staff. While the word "security" was not written on the shirts and hats worn by security staff in violation of Rumor's March 2008 security plan, no additional evidence was introduced that on other occasions the failure of a member of Rumors' security staff to wear a proper uniform had resulted in injuries to a patron. The second incident was based upon evidence presented to the Board regarding an August incident involving the unruly conduct of bartender Khalil. No other evidence regarding petitioner's employee disciplinary measures was introduced. Standing alone, evidence of a single instance in which a member of the security staff became physical with a patron and another where petitioner retained an employee who allegedly assaulted two patrons fails to establish petitioner's adoption of a method of operation that encouraged, caused, or contributed to the disorderly conduct at issue. These two incidents themselves are unrelated to one another. Nor can it be said that either incident "had a demonstrable connection to the operation of the establishment." *Levelle,* 924 A.2d at 1037. Therefore, such evidence is insufficient to sustain one violation of § 25–823(2) let alone two as the Board concluded in this case.

As we explained in *Levelle,* 924 A.2d at 1037, the "types of omissions that are conducive to an unlawful and disorderly environment" require so much more than a single instance of violence traced to a security employee's failure to wear a proper uniform or management's failure to terminate an employee. In *Levelle,* the Board made several determinations, which supported its ultimate conclusion that petitioner's "method of operation caused the establishment to be used for an unlawful or disorderly purpose." *Id.* Here, however, the Board made no extensive determinations, but summarily concluded that Rumors adopted a "method of operating without issuing the proper security uniforms." This determination on its own simply fails to establish that petitioner's "method of operation," *i.e.* its failure to issue proper security uniforms or terminate an employee, "caused the establishment to be used for an unlawful or disorderly purpose." *Id.* Because no evidence was introduced that indicated petitioner had adopted a pattern or regular method of operation that encouraged the endangerment of Rumors' employees and patrons or to the creation of an atmosphere conducive to violence, the Board improperly concluded that petitioner allowed its establishment to

be used for an unlawful or disorderly purpose.

Although under some circumstances, absent evidence of a continuous course of conduct, we have recognized that evidence of a single incident may be sufficient, *see Am–Chi*, 396 F.2d at 687–88, here, there was no evidence presented that petitioner's method of operation created an environment that fostered or was conducive to the endangerment of Rumors' employees and patrons or to the initiation of violence by employees against patrons.

Based on the above, we hold that the Board's conclusion that petitioner allowed its establishment to be used for an unlawful or disorderly purpose is not supported by substantial evidence.

### III.

■ Petitioner next argues that the Board improperly concluded that petitioner violated sections 7 and 1 of its security plan.

D.C.Code § 25–113(d)(1) states that, "[a] nightclub license (N) shall be issued only to a nightclub with a security plan. The holder of a nightclub license shall comply with the terms of its security plan." [7] Although the Board cites and relies upon § 25–113(d)(1), this section merely sets forth the requirement that a licensee maintain a security plan and comply with its terms. However, the statutory provision that provides for the enforcement of that requirement falls under § 25–823(6) (2011 Supp.), which states that, "[t]he Board may fine ... and suspend, or revoke the license of any licensee during the license period if: [t]he licensee fails to follow its ... security plan...."

In 2008, D.C. Council amended § 25–823 to include this additional provision and "require nightclubs to submit security plans with their license applications." D.C. COUNCIL, REPORT ON BILL 17–201 at 1 (Mar. 11, 2008). The Council considered testimony from Peter Feather, the Chairperson of the ABC Board at the time, who testified that requiring nightclubs to have and implement security plans "will help promote a nightlife atmosphere in the District where patrons can feel and be safe in the enjoyment of their nightlife. Violence can occur quickly in a nightclub and it is imperative that these establishments be prepared to respond effectively to these potentially violent incidents immediately." *Id.* at 26.

Just as § 25–823(2) requires a continuous course of conduct to establish that a licensee allowed its establishment to be used for an unlawful or disorderly purpose, see Section I, *supra*, we now hold that § 25–823(6) also requires evidence of a continuous course of conduct to establish that a licensee fails to follow its security plan. Extending the requirement of proof of a continuous course of conduct to § 25–823(6), there is no evidence on the record in this case to indicate that petitioner adopted a course of conduct that resulted in a pattern of deviations from its security plan. The Board's findings reflect three violations of the security plan: Polley's failure to obtain a manager when the Saltzman brothers failed to follow his commands; Polley's failure to instead eject the woman who was acting aggressively towards the brothers; and, security staff member McGrabbin's lack of familiarity with the security plan. However, each of these alleged violations of the security plan is distinct and unrelated as they differ in

7. D.C.Code § 25–403(g) (2011 Supp.) sets forth the required elements that a written security plan must include.

nature and quality from one another. Standing alone, these three violations of the security plan fail to evidence a pattern of violations establishing petitioner's adoption of a pattern or regular method of operation that encouraged deviations from the establishment's security plan. Evidence of isolated violations of the security plan is insufficient to establish petitioner's adoption of a continuous course of conduct and therefore cannot support a finding that petitioner failed to follow its security plan under § 25–823(6). Because the Board in this case relied on these three unrelated incidents, the Board improperly concluded that petitioner failed to follow its security plan.

### IV.

Petitioner last argues that the Board improperly concluded that petitioner failed to allow Investigator Mathieson to examine the books and records of the business because the video footage no longer existed at the time of the investigator's request.

D.C.Code § 25–823(5) states, in relevant part:

> [t]he Board may fine ... suspend, or revoke the license of any licensee during the license period if: [t]he licensee fails or refuses to allow an ABRA investigator ... to enter or inspect without delay the licensed premises or examine the books and records of the business, or otherwise interferes with an investigation.

Section 25–823 was amended in 2008 to also include this provision. As the Council explains, one of the purposes of the amendment was "to strengthen the Board's enforcement authority to fine for ABC violations and take enforcement action for not cooperating with MPD officers and ABRA investigators." D.C. COUNCIL, REPORT ON BILL 17–201 at 1.

The Board concluded that petitioner had "failed to allow Investigator Mathieson to examine its security footage without delay," and that petitioner's "actions amount[ed] to gross disregard of its legal obligations." In particular, the Board focused on the delay of Rumors' manager Mr. Kolokousis in getting back to the investigator, and considered irrelevant the fact that by the time the investigator requested the footage, it no longer existed. However, the Board had no record evidence upon which to draw these conclusions. Petitioner's mere failure to respond to the investigator could not amount to a failure or refusal to allow an investigator to examine the books and records of the business, especially when petitioner could not retrieve the video footage because it no longer existed. Although we do not condone the manner in which petitioner responded to the investigator's request, a lack of dispatch without evidence of more does not amount to a failure to allow an investigator to examine the books and records of the business in violation of D.C.Code § 25–823(5). Therefore, the Board's conclusion is not supported by substantial evidence.

### V.

For the foregoing reasons, we reverse the Board's order.

*So ordered.*