*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-AA-467

1215 CT, LLC t/a ROSEBAR LOUNGE, PETITIONER,

v.

DISTRICT OF COLUMBIA ALCOHOLIC
BEVERAGE CONTROL BOARD, RESPONDENT.

On Petition for Review of an Order
of the District of Columbia
Alcoholic Beverage Control Board
(16-251-00125)

(Submitted October 18, 2018               Decided August 8, 2019)

*Paul J. Kiernan* and *Kristina A. Crooks* were on the brief for petitioner.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Stacy L. Anderson*, Acting Deputy Solicitor General at the time the brief was filed, and *Richard S. Love*, Senior Assistant Attorney General, were on the brief for respondent.

Before THOMPSON and MCLEESE, *Associate Judges*, and NEBEKER, *Senior Judge*.

THOMPSON, *Associate Judge*:   Petitioner 1215 CT, LLC t/a Rosebar Lounge

("Rosebar") seeks review of an April 26, 2017, decision and order of the District of

Columbia Alcoholic Beverage Control Board ("the Board") that imposed a $4,000

fine and a seven-day suspension of Rosebar's liquor license for a violation of D.C.

Code § 25-823(a)(6) (2012 Repl. And 2019 Supp.).[1] Specifically, the Board found that on May 1, 2016, Rosebar "violated the terms of its security plan related to the use of force . . . ."

Rosebar acknowledges for purposes of its petition that the Board's factual findings are adequately supported by the record, but argues that the Board incorrectly applied § 25-823 when it found that a single violation of Rosebar's security plan (the "Security Plan") on file with the Alcoholic Beverage Regulation Administration ("ABRA") constituted a violation of § 25-823(a)(6). For the reasons that follow, we affirm the Board's decision.

## I.

Rosebar operates at 1215 Connecticut Avenue, N.W., and holds a Class CT License. On August 8, 2013, it submitted to ABRA its Security Plan, which describes strategies to be used to deal with uncooperative patrons and altercations that may arise between patrons. In pertinent part, Rosebar's Security Plan provides that:

---

[1] The Board stayed the suspension pending resolution of the petition for review.

> Staff cannot legally use force against a person unless in self-defense or defense of others from imminent harm . . . . At our venue staff may not use restraints or control holds; . . . tackling; . . . piling on top; . . . [or] pain compliance holds.
>
> . . .
>
> Escorting a patron out of a venue involves the use of professional verbal commands and a polite explanation of why they are being asked to leave[.]
>
> The staff member should warn the guest that they must leave the premises immediately or be subject to arrest by the police. If the ejected patron attacks anyone, reasonable force can be used in self-defense.
>
> . . .
>
> There may come times when deviation may be necessary to ensure the safety of our patrons and staff. Your supervisors will inform you of such cases if necessary.

The Board found that during an incident on May 1, 2016 (the "May 2016 incident"), Rosebar violated the provisions of its Security Plan related to the use of force and the ejection of patrons. The incident, which was captured on video footage reviewed by the Board, involved patron Zunnobia Hakir and Rosebar security guard Bobby Noupa. The Board found that the first use of force occurred after Mr. Noupa asked Ms. Hakir to leave a section of the establishment in the wake of complaints that she had caused trouble at a table. After Ms. Hakir leaned

down to retrieve an item from her anklet pouch and then stood back up, Mr. Noupa pushed Ms. Hakir away from him. Mr. Noupa testified before the Board that he did not know what Ms. Hakir had in her hand and believed that she was attacking him, and in response, he "turned her around and decided to escort her out of the establishment." The Board found that Mr. Noupa did that by "wrap[ping] up [Ms. Hakir's] arms from behind by sticking his arms under her armpits" and then "walk[ed] her out of the establishment while maintaining the hold from behind." The Board found that Ms. Hakir "did not have a weapon in her hands" and concluded that Mr. Noupa could not reasonably have feared for his safety and that his use of force was unjustified.

The Board found that the second use of force occurred when Mr. Noupa, with Ms. Hakir in tow, approached the staircase leading to the establishment's main entrance. Mr. Noupa proceeded to pull Ms. Hakir down the stairs by her arms, so that she either was dragged or fell to the landing in the middle of the divided staircase. The Board found that Mr. Noupa's conduct was "disproportionate, excessive, and unreasonable," could not "qualify as self-defense," and violated the terms of the Security Plan regarding the use of force.

Shortly after the May 2016 incident, John Suero, a supervisory investigator with ABRA, went to Rosebar and interviewed managers there. Investigator Suero testified that Alcoholic Beverage Control Board ("ABC") Manager Franco McGarrit and head of security Adrian Mack told him that they saw Ms. Hakir being removed from Rosebar. Mr. Mack also acknowledged that Rosebar had a policy that was "part of the security plan" that required security staff to request assistance from someone else or management in the event that a patron needs to be ejected. Mr. Mack told Investigator Suero that "no one had [called him about the May 1, 2016, incident]."

Having noted that § 25-823(c) requires an establishment to comply with its security plan at "all times that [the licensee] is in operation" and provides that "[a] single violation of a . . . security plan . . . shall be sufficient to prove a violation . . . [,]" the Board sustained the charge that Rosebar violated §25-823(a)(6).

Rosebar now asserts that the Board's interpretation of § 25-823(c) with respect to a single violation is "completely unworkable," is "incongruent with the legislative history," "leads to unreasonable results," "undermines the public-safety goals" of the District of Columbia alcoholic beverage control law, and cannot be squared with this court's decision in *1900 M Rest. Ass'ns v. District of Columbia*

*Alcoholic Beverage Control Bd.* ("*Rumors*"), 56 A.3d 486 (D.C. 2012). Rosebar contends that it is entitled to reversal of the Board's order because the Board did not find that Rosebar engaged in a "method of operation that encouraged deviations from its security plan."

## II.

The scope of our review of Board decisions is well-established. "Under the general limited review that we undertake of any agency decision, we must affirm unless we conclude that the agency's ruling was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Panutat, LLC v. District of Columbia Alcoholic Beverage Control Bd.*, 75 A.3d 269, 272 (D.C. 2013) (internal quotation marks omitted). "[W]here questions of law are concerned, we review agency's rulings de novo because we are presumed to have the greater expertise when the agency's decision rests on a question of law, and we therefore remain the final authority on issues of statutory construction." *Recio v. District of Columbia Alcoholic Beverage Control Bd.*, 75 A.3d 134, 141 (D.C. 2013) (internal quotation marks omitted). That said, "[w]e accord considerable deference to the Board's interpretation of statutes it is charged with administering, and we will uphold the Board's interpretation of Title 25 and legislative enactments affecting it as long as

the interpretation is reasonable and not plainly wrong or inconsistent with the legislative purpose." *800 Water St., Inc. v. District of Columbia Alcoholic Beverage Control Bd.*, 992 A.2d 1272, 1274 (D.C. 2010) (internal quotation marks omitted).

"[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Accordingly, "[t]he primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *Varela v. Hi-Lo Powered Stirrups, Inc.*, 424 A.2d 61, 64-65 (D.C. 1980) (en banc) (quoting *United States v. Goldenberg*, 168 U.S. 95, 102-03 (1897)). "[I]n examining the statutory language, it is axiomatic that the words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them." *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc) (internal quotation marks omitted). However, "there is wisely no rule of law forbidding resort to explanatory legislative history no matter how clear the words may appear on superficial examination." *Harrison v. N. Tr. Co.*, 317 U.S. 476, 479 (1943) (internal quotation marks omitted). Thus, "even where the words of a statute have a superficial clarity," *Peoples Drug Stores*, 470 A.2d at 754 (internal quotation marks omitted),

"we may turn to legislative history to ensure that our interpretation is consistent with legislative intent[,]" *Aboye v. United States*, 121 A.3d 1245, 1249 (D.C. 2015) (internal quotation marks omitted).

## III.

This court has not interpreted § 25-823 since the Council of the District of Columbia (the "Council") amended it in 2015 to designate the existing text as subsection (a) and to add subsections (b) and (c). *See* D.C. Law 20-270, § 2(f)(2), 62 D.C. Reg. 1866, 1871-72 (Feb. 13, 2015). However, in our 2012 opinion in *Rumors*, we construed the provision that was redesignated in 2015 as § 25-823(a)(2) (authorizing the Board to impose a fine or license suspension or revocation if "[t]he licensee allows the licensed establishment to be used for any unlawful or disorderly purpose"). We concluded that "the relevant inquiry for this court to consider in reviewing the ABC Board's conclusion that a licensee allowed its establishment to be used for an unlawful or disorderly purpose is whether there is substantial evidence of a course of conduct, continued over time, that reflects the licensee's adoption of a pattern or regular method of operation that encouraged, caused, or contributed to the unlawful or disorderly conduct at issue." *Rumors*, 56 A.3d at 493. We similarly construed the provision that was redesignated in 2015

as 25-823(a)(6) (authorizing the Board to impose a fine or license suspension or revocation if "[t]he licensee fails to follow its . . . security plan"). *Id.* at 495. We interpreted that provision, too, to "require[] evidence of a continuous course of conduct" to prove that a licensee failed to follow its security plan. *Id.* We held that the Board "improperly concluded that [Rumors] failed to follow its security plan," *id.* at 496, reasoning as follows:

> The Board's findings reflect three violations of the security plan: Polley's failure to obtain a manager when the Saltzman brothers failed to follow his commands; Polley's failure to instead eject the woman who was acting aggressively towards the brothers; and, security staff member McGrabbin's lack of familiarity with the security plan. However, each of these alleged violations of the security plan is distinct and unrelated as they differ in nature and quality from one another. Standing alone, these three violations of the security plan fail to evidence a pattern of violations establishing petitioner's adoption of a pattern or regular method of operation that encouraged deviations from the establishment's security plan. *Evidence of isolated violations of the security plan is insufficient to establish petitioner's adoption of a continuous course of conduct and therefore cannot support a finding that petitioner failed to follow its security plan under § 25-823(6).*

*Id.* at 495-96 (emphasis added).

The Council amended § 25-823 in 2015 "to clarify and codify the current state of the law in light of the *Rumors* decision . . . ." Committee on Business, Consumer, and Regulatory Affairs, D.C. Council, Report on Bill 20-902 at 2 (Nov. 17, 2014) ("Committee Report" or the "Report"). The Council added § 25-823(b), which provides that "[a] single incident of assault, sexual assault, or violence shall be sufficient to prove a violation of subsection (a)(2) of this section; provided, that the licensee has engaged in a method of operation that is conducive to unlawful or disorderly conduct." *See* D.C. Law 20-270, § 2(f)(2), 62 D.C. Reg. at 1872. The Council also added § 25-823(c), the provision the Board applied in the instant case. *Id.* Section 25-823(c) provides that:

> A licensee shall be required to comply with the terms and conditions of the licensee's settlement agreement, security plan, or order from the Board that is attached to the license during all times that it is in operation. A single violation of a settlement agreement, security plan, or order from the Board shall be sufficient to prove a violation of subsection (a)(6) of this section.

D.C. Code § 25-823(c).

Rosebar relies on the Council's expressed intent to codify the *Rumors* decision to imply that § 25-823(c) cannot mean without qualification what it says about a single security-plan violation sufficing to prove a violation. Rosebar

implies that § 25-823(c) must be understood to include the same proviso that § 25-823(b) contains. Rosebar argues that, as *Rumors* established, the Board could find a violation of § 25-823(a)(6) only if it had before it "evidence of a continuous course of conduct to establish that [Rosebar] fail[ed] to follow its security plan." *Rumors*, 56 A.3d at 495.

We disagree.[2] To begin with, the statutory language is clear and unambiguous on its face; § 25-823(c) makes a single violation of a security plan sufficient to prove a violation of § 25-823(a)(6) and contains no "method of operation that is conducive" proviso. Hence, *Rumors* notwithstanding, the Board's interpretation that the Rosebar Security Plan violations that occurred during the May 1, 2016, incident were sufficient to establish a violation, was "not plainly wrong." *800 Water St.*, 992 A.2d at 1274. We have previously recognized the unremarkable principle that a court opinion is no longer controlling when it has been superseded by a statute that codifies an interpretation that the court rejected. *See, e.g.*, *Frankel v. District of Columbia Office for Planning & Econ. Dev.*, 110 A.3d 553, 557 (D.C. 2015) (noting that a D.C. Circuit opinion "was superseded by statute when Congress amended the federal FOIA to codify the catalyst theory" the

---

[2] We note that we have no occasion to consider whether the two instances of improper use of force by Rosebar security employee Noupa on a single evening could reasonably be said to amount to a course of conduct by Mr. Noupa.

D.C. Circuit had rejected); *see also Hazel v. United States*, 483 A.2d 1157, 1159 (D.C. 1984) ("When the legislature acts in an area in which it is competent to act, such enactment limits the authority of the court." (citation omitted)).

Second, while the Committee Report refers to the Council's intent "to clarify and codify the current state of the law in light of the *Rumors* decision . . . ," Committee Report at 2, the very next sentence in the Report explains what that means: "The amended language [in § 25-823(b)] clarifies that a single incident of assault, sexual assault, or violence is sufficient to sustain a violation provided that the licensee has engaged in a method of operation that is conducive to unlawful or disorderly conduct." That explanation, which is set out in a section of the Report entitled "Acts of Violence," is faithful to the text of § 25-823(b).[3] While the Committee might have included a sentence explaining that it intended to codify the

_____

[3] Rosebar relies on the third sentence, which states that "[t]he amendment seeks to reduce collective case law to statutory form and is not intended to change the status of the law or the burden of proof required by the *Rumors* decision, or the decisions in *Levelle, Inc. v. D[istrict of]C[olumbia] Alcoholic Beverage Control Bd.*, 924 A.2d 1030 (D[.]C[.] 2007)[,] and *Am-Chi Rest.[, Inc.] v. Simonson*, 396 F.2d 686 (1968)." But the fact that, as noted above, this discussion is in a section of the Report entitled "Acts of Violence" makes it reasonable to read it as referring to maintaining the status of the law and the burden of proof as to charged violations of § 25-823(a)(2), relating to allowing an establishment to be used for an unlawful or disorderly purpose. That reading is also supported by the fact that the "use[] for any unlawful or disorderly purpose" provision is the only provision of what is now § 25-823(a) that is discussed in *Levelle*, 924 A.2d at 1035, and *Am-Chi*, 396 F.2d at 687.

holding in *Rumors* with respect to what is necessary to establish a licensee's failure to follow its security plan, it did not do so, and with good reason: such an explanation, far from being faithful to the text of new § 25-823(c), would have contradicted that new provision, which declares that a single violation of a security plan "shall be sufficient to prove a violation of subsection (a)(6)," without any proviso.

Third, in the section of the Committee Report entitled "Impact on Existing Legislation," the Committee explained the impact of *both* § 25-823(b) and § 25-823(c):

> [The amended statute] would allow the Board to hold licensees responsible for a single assault, sexual assault, or other violent act provided that the licensee has engaged in a method of operation that is conducive to unlawful or disorderly conduct. Finally, the bill clarifies that a licensee may be held accountable for a single violation of its settlement agreement, security plan, or Board order.

Committee Report at 11. The juxtaposition confirms that the legislators' intent with respect to what is necessary to establish an "unlawful or disorderly purpose" violation is different from their intent with respect to what is necessary to establish a violation of a security plan. Accordingly, we cannot say that the Board's

interpretation of § 25-823(c) was "inconsistent with the legislative purpose." *800 Water St.*, 992 A.2d at 1274.

Fourth, the Committee Report includes comments on the proposed legislation by ABRA Director Fred P. Moosally, which suggest why it is not unreasonable to treat "unlawful or disorderly purpose" violations in a manner different from security-plan violations. Director Moosally referred to "concerns raised at the October 27 hearing regarding the proposed . . . [b]ill provision involving a licensee being found in violation for a single violent incident *outside of the licensee's control*[.]" Committee Report at 109-11 (emphasis added). He relayed ABRA's recommendation that the Council add additional language to the end of proposed subsection 25-823(b) so that the provision would read as follows:

> A single incident of assault, sexual assault, or violence shall be sufficient to prove a violation of subsection (a)(2) of this section *provided that there is a demonstrable connection between the incident and the establishment's operation.*

Committee Report at 109-11 (emphasis added). Director Moosally explained that ABRA's proposed language would clarify that a licensee is not responsible for a single incident of assault, sexual assault, or violence "where there is not a

demonstrable connection between the incident and the establishment's operation." *Id.* The Council added the "method of operation that is conducive" proviso instead of the language ABRA proposed, but ABRA's proposed language points to why it is not unreasonable to treat a single violation of an establishment's security plan, without qualification, as sanctionable: the assumption that there is generally, if not always, a demonstrable connection between an establishment's operation (e.g., whether it trains its staff on the details of its security plan, whether it holds its managers accountable for enforcing the security plan, etc.) and a violation of its security plan. The facts of this case demonstrate such a connection: although one of Rosebar's managers and its head of security observed Mr. Noupa forcibly removing Ms. Hakir from Rosebar, neither of those individuals (nor any other managers or security employees) intervened to enforce the procedures specified in the Security Plan regarding the ejection of patrons and the use of force. For his part, Mr. Noupa failed to summon assistance from a manager even though, per the testimony of head of security Mr. Mack, Rosebar's Security Plan required security staff to request assistance in the event that a patron needs to be ejected.

Finally, we address Rosebar's argument that the Board's "single incident" interpretation is "unworkable," "leads to unreasonable results," and "undermines the public-safety goals." Rosebar asserts that the "practical import" of the Board's

interpretation is that "licensees will almost certainly start to curtail their security plans," and will omit details that amount to "more opportunities for noncompliance," with the result that they will have "bare-bones security plan[s]" that will "undermine the public-safety aims of the ABC Law." We are not persuaded by this argument.

D.C. Code § 25-402(d)(3) (2019 Supp.) provides that a licensee's written security plan "shall include at least the following elements":

(A) A statement on the type of security training provided for, and completed by, establishment personnel, including:

(i) Conflict resolution training;

(ii) Procedures for handling violent incidents, other emergencies, and calling the Metropolitan Police Department; and

(iii) Procedures for crowd control and preventing overcrowding;

(B) The establishment's procedures for permitting patrons to enter;

(C) A description of how security personnel are stationed inside and in front of the establishment and the number and location of cameras used by the establishment;

(D) Procedures in place to prevent patrons from becoming intoxicated and ensuring that only persons 21 years or older are served alcohol;

(E) A description of how the establishment maintains an incident log; and

(F) The establishment's procedures for preserving a crime scene.

D.C. Code § 25-402(d)(3)(A)-(F). Because the mandated elements will require an establishment's security plan to include a significant level of detail, we think Rosebar's concern is not well-founded.[4]

---

[4] Rosebar also complains that under the Board's interpretation, it will be held accountable if, for example, its personnel fail to comply with the Security Plan provision that states that "[a]ll guests must receive an enthusiastic exit greeting." We see no reason to think that the Board would seek to enforce that provision, because it has nothing to do with the elements that must be included in a security plan per § 25-402(d). And, in any event, it is not obvious to us why an establishment would include an "enthusiastic exit greeting" provision in its *security* plan.

## IV.

For all the foregoing reasons, the Board's order is

*Affirmed.*